**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,
                    **Plaintiff,**
        v.

TIMOTHY PAGE, TREVOR PAGE,
TICINO CAPITAL LIMITED,
WELLESLEY HOLDINGS LIMITED,
PORRIMA LIMITED, EMERGENT
INVESTMENT COMPANY, and FJ
INVESTMENTS INTERNATIONAL
INC.,

                    **Defendants.**

JANAN PAGE,

                    **Relief Defendant.**

Civil Action No. 21-CV-_____

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the
following against defendants Timothy Page, Trevor Page, Ticino Capital Limited ("Ticino"),
Wellesley Holdings Limited ("Wellesley"), Porrima Limited ("Porrima"), Emergent Investment
Company ("Emergent"); and FJ Investments International Inc. ("FJ Investments") (and
collectively, the "Defendants") and relief defendant Janan Page:

## SUMMARY

1.      This is a securities fraud enforcement action. Starting no later than 2016 and
continuing through at least July 2019, the Defendants schemed fraudulently to sell the stock of
various publicly traded companies, including the stock of Link Reservations, Inc. ("Link"),

EnviroTechnologies International, Inc. ("EnviroTechnologies"), Cyberfort Software Inc. ("Cyberfort"), and BioHemp International, Inc. ("BioHemp"), to investors in the public United States securities markets. Timothy and Trevor Page used nominees—including defendants Ticino, Wellesley, Porrima, Emergent, and FJ Investments—to disguise their holdings of substantial interests in publicly traded companies. Timothy Page and Trevor Page also engaged boiler rooms (*i.e.*, call center operations designed to lure investors to purchase stock, often using high-pressure sales tactics) to generate artificial demand for their stock by making false and misleading statements to investors.

2.      Further, when market demand for their unsold shares dried up towards the end of the various boiler room promotional campaigns that they funded, Timothy and Trevor Page agreed to pay kickbacks to an individual who they believed was a corrupt broker. The Pages believed the broker would buy the Pages' worthless shares in unsuspecting brokerage customers' accounts (hereinafter referred to as "cross trades"). Unbeknownst to the Pages, they coordinated these cross trades with an individual who was cooperating with a Federal Bureau of Investigation ("FBI") investigation, and the Pages paid these cross trade kickbacks to an entity controlled by the FBI.

## VIOLATIONS

3.      As a result of the conduct alleged herein, Timothy Page, Trevor Page, Wellesley, Emergent, and Porrima violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; Ticino and FJ Investments violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder; Timothy Page and

Trevor Page violated Section 9(a)(2) of the Exchange Act; and Timothy Page, Trevor Page and

FJ Investments also violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

4.      The Commission seeks a permanent injunction against the Defendants, enjoining

them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest under Section 21(d)(7) of the Exchange Act [15

U.S.C. §78u(d)(7)], civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring

Trevor Page from participating in any offering of a penny stock, pursuant to Section 20(g) of the

Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C.

§78u(d)]; orders enjoining Timothy Page and Trevor Page from directly or indirectly, including,

but not limited to, through an entity owned or controlled by Timothy Page or Trevor Page,

participating in the issuance, purchase, offer or sale of any security, provided, however, that such

injunction shall not prevent Timothy Page or Trevor Page from purchasing or selling securities

listed on a national securities exchange for their own personal accounts; and such other relief as

the Court may deem appropriate.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), and 78aa].

6.      Venue lies in this District pursuant to Section 22(a) of the Securities Act [15

U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the acts,

practices, transactions and courses of business alleged in this Complaint occurred within the Eastern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, during the period described in this Complaint, individuals who reside in the Eastern District of New York purchased the stock of EnviroTechnologies and Cyberfort.

## DEFENDANTS

7.     Timothy ("Tim") Page, 71, is a citizen of the United Kingdom ("U.K.") and, at various times, resided in the U.K., Switzerland and Fiji. Tim Page was charged by the Commission in two actions filed in 2007 and 2009 for violating Sections 5(a) and 5(c) of the Securities Act in connection with several stock offerings, as well as a violation of Section 15(a)(1) of the Exchange Act in the 2009 matter. *SEC v. Phillip W. Offill, Jr., et al.* (Case No. 07-cv-01643 (N.D. Tex.)); *SEC v. Connectajet.com, Inc., et al.* (Case No. 09-cv-01742 (N.D. Tex.)).

8.     Trevor Page, 35, is a U.K. resident and is Tim Page's son.

9.     Ticino Capital Limited is a Maltese corporation formed in June 2014, owned on paper by a Swiss attorney. Tim and Trevor Page used brokerage accounts held in Ticino Capital's name illegally to sell shares of stock and used bank accounts held in Ticino Capital's name to compensate boiler room operators to promote stocks they were selling and for other purposes.

10.    Wellesley Holdings Limited is a Hungarian corporation formed in May 2018, owned on paper by a Swiss citizen. Tim and Trevor Page used a brokerage account in the name of Wellesley illegally to sell shares of at least one company (BioHemp International, Inc. ("BioHemp")) and used a bank account in the name of Wellesley secretly to provide financing to

BioHemp's operations.

11.    Porrima Limited is a Hungarian corporation formed in February 2018, owned on paper by a Hungarian lawyer based in Budapest. Tim and Trevor Page used a brokerage account in the name of Porrima Limited illegally to sell shares of at least BioHemp.

12.    Emergent Investment Company is a Hungarian corporation formed in February 2018, owned on paper by a citizen of the Philippines, where Tim Page owns property. Tim and Trevor Page used a brokerage account in the name of Emergent illegally to sell shares of BioHemp, and Tim Page was an authorized signer on Emergent's Hungarian bank account.

13.    FJ Investments International Inc. is a Utah corporation formed in early 2018 and controlled by a Utah resident. The Utah resident incorporated FJ Investments to acquire and hold the controlling block of shares of BioHemp as a nominee for Tim Page.

## RELIEF DEFENDANT

14.    Janan Page, 63, is a resident of the U.K., Switzerland and Fiji. She is the wife of Tim Page. Illicit proceeds of Tim and Trevor Page's fraud were directed to bank and brokerage accounts held in Janan Page's name. Brokerage accounts held in Janan Page's name were also used to conduct manipulative trades in securities that Tim and Trevor Page were selling.

## RELATED PARTIES

15.    EnviroTechnologies represents in public filings that it is an organic products company. EnviroTechnologies (Ticker: ETII) trades on the OTC Markets (defined in Paragraph 25, below). EnviroTechnologies was incorporated in Delaware in 1996 under the name HIS of Virginia, Inc., and is currently headquartered in Pleasant Grove, Utah.

16.     Cyberfort is a Nevada corporation, currently headquartered in San Francisco, California.   Cyberfort represents in public filings that it is focused on providing software security technology.   Cyberfort's common stock (Ticker: CYBF) is quoted on the OTC Markets.

17.     BioHemp is a Nevada corporation that purportedly has a principal place of business in New York, New York.   BioHemp was originally incorporated in Nevada in August 2012 as Book It Local Inc., and in August 2013, Book It Local filed a Form 8-A12G to register a class of its securities under the Exchange Act.   Since that time, the company has had a reporting obligation under Section 15(d) of the Exchange Act.   During the time period at issue in this Complaint, BioHemp stock (Ticker: BKIT) was quoted on the OTC Markets.   The Commission suspended trading in BioHemp stock (Ticker: BKIT) for 10 days effective July 26, 2019 and in May 2021, commenced a proceeding to determine whether the registration of its shares should be revoked.

18.     Link is a Nevada corporation headquartered in Herefordshire, U.K.   Link was originally incorporated in December 2006 as Wishart Enterprises, Ltd.   In June 2010, Wishart changed its name to Vendum Batteries, Inc.   In May 2015, Vendum Batteries changed its name to Link.   Link's common stock is quoted on OTC Markets under the symbol LRSV.

## **BACKGROUND**

19.     Persons who control companies which have stock that is sold to the public ("control persons") are subject to a variety of legal and regulatory requirements. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

20.     Before selling stock, control persons are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. § 77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], including limitations on the amount of stock a control person can legally sell. Also, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.

21.     "Restricted stock" includes stock of a company whose shares are traded publicly (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission. In addition, stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains important information about an issuer's business operations, financial condition, results of operations, risk factors, and management. It also includes disclosure of any person or group who is the beneficial owner of more than 5% of the company's securities.

22.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person). "Control" means the power to direct management and policies of the company in question. Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer. As

used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

23.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement. Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement. Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

24.     A "transfer agent" is a company that, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether shares are restricted from resale.

25.     Over-the-Counter ("OTC") Markets, Inc. is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange). Public companies that do not have an obligation to file reports with the Commission may choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.

26.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

27.     "Pump-and-dump" schemes typically involve company shareholders touting, or "pumping," (or paying others to tout or "pump") a company's stock through false and misleading statements or through manipulative trading, for the purpose of creating market demand into which those same shareholders sell, or "dump," their shares.

## FACTUAL ALLEGATIONS

## ENVIROTECHNOLOGIES SCHEME TO DEFRAUD

28.     From 2016 through 2018, Tim and Trevor Page coordinated with at least two other individuals to engineer a pump-and-dump scheme by concealing their control over EnviroTechnologies.  By hiding their control, Tim and Trevor Page sold their EnviroTechnologies' stock without registering the sales or complying with legally mandated sale limitations, while concealing from prospective purchasers that EnviroTechnologies' stock was being sold, in bulk, by the people who controlled the company.

29.     In furtherance of their scheme fraudulently to sell EnviroTechnologies' stock, Tim and Trevor Page, directly or indirectly, secretly controlled EnviroTechnologies by: (a) providing significant funding to the company; (b) engaging an officer of EnviroTechnologies' board to be their company insider; and (c) controlling a significant percentage of the company's stock.

### Funding and Board Control

30.     Starting no later than July 2016, Tim and Trevor Page began working closely with an individual (identified herein as Person A) to ensure that EnviroTechnologies stock could be quoted for trading on OTC Markets.  During a conversation surreptitiously recorded between a

witness who was cooperating with an FBI investigation and Tim Page on or about February 13, 2018, Tim Page referred to Person A as his "partner" on the EnviroTechnologies deal.

31.     Person A was an EnviroTechnologies paid consultant. Person A prepared and filed EnviroTechnologies' financial statements. Person A also arranged for payment of EnviroTechnologies' semi-annual fees to OTC Markets by using a credit card that had been issued to Janan Page. These filings enabled EnviroTechnologies to be listed for trading by OTC Markets, which subsequently enabled Tim and Trevor Page to sell their shares to other investors.

32.     Tim Page was a significant source of funding for EnviroTechnologies between March 2017 and May 2019. Tim Page, however, arranged to obfuscate the fact that he was the source of that funding to avoid the appearance that he directly or indirectly controlled EnviroTechnologies. For example, Tim Page arranged to fund EnviroTechnologies' operations by transferring funds from several accounts he controlled, including accounts held in the name of Ticino and Emergent, to accounts controlled by an officer of EnviroTechnologies (identified herein as Person C), who in turn transferred the funds to EnviroTechnologies. Examples of transfers follow:

    i.   On or about March 7, 2017, Tim Page paid $16,961.65 from his personal bank account to a company controlled by Person C ("Person C's Company"). On March 8, 2017, Person C's Company wired $15,000 to EnviroTechnologies. Following this wire transfer, the remaining balance in Person C's Company's account was less than $3,600.

    ii.   On or about March 21, 2017, Ticino paid $49,980 to Person C's Company. On the same day, Person C's Company wired $49,950 to

EnviroTechnologies.   Following this wire transfer, the remaining balance in
Person C's Company's account was less than $900.

iii.   On or about October 16, 2018, Emergent paid $14,966 to Person C's
Company.   On October 17, 2018, Person C's Company wired $14,960 to
EnviroTechnologies.   Following this wire transfer, the remaining balance in
Person C's Company's account was less than $400.

33.   Tim Page knew, or was reckless in not knowing, that Person C's Company was a
dormant LLC that Person C used to funnel money to EnviroTechnologies.   Person C and Tim
Page executed promissory notes between Person C's Company and Tim Page (or Tim Page's
companies) to make it seem as if the transfers resulted from a loan arrangement when, in
actuality, they did not.

## Stock Control

34.   Tim and Trevor Page, working with Person A, directly or indirectly controlled
almost all of EnviroTechnologies' purportedly unrestricted stock.  For example, in September
2016, three foreign entities controlled by Tim and Trevor Page, including defendant Ticino,
acquired a class of stock that could be converted into commonly traded stock (*i.e.*, a type of stock
that can typically be traded in the public securities markets if it is unrestricted).  These three
entities all exercised their conversion rights in October 2016, making them the owners of a total
of 30,000,000 common shares of EnviroTechnologies.

35.   Shortly thereafter, Person A facilitated the assignment of a convertible promissory
note to two other foreign entities controlled by Tim and Trevor Page, which Tim and Trevor
Page arranged to have converted into a total of 20,000,000 additional common shares of
EnviroTechnologies in 2017.

36.     Having consolidated control of 50,000,000 common shares of EnviroTechnologies stock, Tim and Trevor Page arranged to have the stock certificates issued without restrictive legends on the basis of false and misleading opinion letters authored by EnviroTechnologies' securities counsel (hereinafter referred to as "Person B").

37.     Trevor Page coordinated with Person B to author the false and misleading opinion letters. For example, on or about October 3, 2016, Trevor Page emailed Person B and requested opinion letters for three offshore nominees that were holding his (and Tim Page's) stock. Opinion letters are intended to be provided to transfer agents to authorize the transfer agents to issue stock without a restricted legend (which would prevent the shares from being deposited with a broker dealer and sold to investors in the public market).

38.     On or about October 3, 2016, Trevor Page used his credit card to pay $900 to Person B for the three opinion letters.

39.     The opinion letters were false and misleading because, among other things, Person B represented to the company's transfer agent that the Pages' entities were not affiliates of EnviroTechnologies. In actuality, the entities were nominees that were used to conceal the Pages' identities, and Tim and Trevor Page were affiliates of EnviroTechnologies by virtue of their control over the company's operations and its stock.

40.     The table below illustrates the stock transfers to the Pages' entities, as described in Paragraphs 34 through 36, above. As shown in this chart, Red Crane Ltd., Car Rus Consulting, Norfolk Heights Ltd., and Company A were controlled by, or held stock on behalf of

and at the direction of, Tim and Trevor Page.



**Illegal Sales of EnviroTechnologies Stock**

41.      Red Crane Ltd. then transferred its shares to a foreign entity that purported to be an asset manager, but really just served as part of a trading platform to dump penny stocks for various control groups.  Norfolk Heights Ltd. was another nominee that was also part of the same trading platform.[1]  Between approximately February 2017 and May 2018, Tim and Trevor Page and others with whom they were coordinating  arranged for the foreign asset manager/trading platform to dump their EnviroTechnologies  stock.  The sales occurred in two waves: February through June 2017, and February through May 2018.

---

[1] The Commission charged, and obtained judgments against, Norfolk Heights Ltd. and Fountain Drive Ltd. (see paragraph 50 herein) in a separate case for their role as part of an illicit trading platform. *See SEC v. Bajic, et al.*, No. 20-cv-0007 (S.D.N.Y., filed Jan. 2, 2020).

42.     During the time period February through June 2017, Tim and Trevor Page sold, directly or indirectly, approximately 3.9 million shares of EnviroTechnologies stock for proceeds of approximately $3.7 million.

43.     On 46 of the 101 available trading days between February 7, 2017 and June 16, 2017, Tim and Trevor Page's stock sales accounted for more than 50% of the total market volume for EnviroTechnologies.   As the chart below reflects, between February and June 2017, this trading on behalf of Tim and Trevor Page effectively increased the price of the stock from $0.60 per share to a high of $1.93 per share on April 7, 2017, at which point the notional market capitalization of EnviroTechnologies was at least $390 million.



44.     By February 2018, the volume of trading in EnviroTechnologies stock had decreased, which negatively affected Tim and Trevor Pages' ability to sell their remaining EnviroTechnologies' shares profitably.   To address this issue, Tim and Trevor Page manipulated the market for EnviroTechnologies' stock by creating the false appearance of active trading in EnviroTechnologies' shares.

14

45.     In particular, during a conversation surreptitiously recorded between a witness who was cooperating with an FBI investigation and Tim Page on or about February 13, 2018, Tim Page complained that he was not able to sell as much stock as he wanted to because of the low volume. Tim Page further explained: "we are maintaining the price, and it's costing us money, and it's very frustrating because I can't capture . . . so it's costing me money just trying to maintain that so I'm getting very frustrated." Tim Page was describing his efforts to maintain an artificially high stock price by entering small and manipulative buy orders—which had the effect of creating an artificial appearance of market demand— aimed at enabling Tim Page and Trevor Page to sell their remaining EnviroTechnologies shares at an artificially high price.

46.     As Tim Page described during the February 13, 2018 recorded conversation, Tim Page had arranged for brokerage accounts held in Janan Page's name to place many small buy orders of EnviroTechnologies stock to maintain its price. Tim Page arranged the buy orders for the purpose of artificially increasing the price per share of EnviroTechnologies' stock and for the purpose of inducing others to invest.

47.     The chart below illustrates Tim Page's manipulative efforts to buy EnviroTechnologies stock to prevent the stock price from declining further than it already had on a given day or to stabilize the stock price at a daily high:



48.     Within a few months, Tim Page took additional steps to generate demand for his and Trevor Page's EnviroTechnologies' shares that they had yet to sell. Specifically, in or about April and May 2018, Tim Page hired a boiler room to generate more demand for EnviroTechnologies stock held, directly or indirectly, by him and Trevor Page.

49.     Tim Page and Trevor Page knew, or were reckless in not knowing, that the boiler room operator (hereinafter referred to as the "Boiler Room Operator") would tout EnviroTechnologies' shares as a good investment opportunity without disclosing that Tim Page had hired the boiler room, and without disclosing that the persons who controlled the company intended to sell their shares to the unsuspecting investors solicited by the boiler room.

50.     As the table below reflects, the profits from Tim Page and Trevor Page's sales of EnviroTechnologies shares were distributed to Ticino and at least one other entity controlled by

16

Tim and Trevor Page. Person A and the Boiler Room Operator also received some of those proceeds.



51.     Tim and Trevor Page knew, or were reckless in not knowing, that their shares were legally required to be registered and, therefore, were restricted from resale. Tim and Trevor Page schemed to defraud the company's transfer agent and the market by concealing their control over EnviroTechnologies by evading their disclosure obligations as affiliates of the company.

52.     Tim and Trevor Page's sale of their EnviroTechnologies' stock between February 2017 and May 2018 yielded combined profits of more than $4.5 million.

**DEFENDANTS' ENVIROTECHNOLOGIES REGISTRATION VIOLATIONS**

53.     Tim Page and Trevor Page's EnviroTechnologies stock sales involved an underwriter. For example, the Pages were underwriters because they were affiliates who

acquired EnviroTechnologies stock with the intent to distribute it. Further, the foreign brokers and foreign account operators who sold stock on the Pages' behalf also acted as underwriters because the foreign brokers and foreign account operators were selling shares for affiliates in connection with the distribution of the securities to the public. Accordingly, the sales were required to be registered or otherwise comply with the conditions set forth in SEC Rule 144 because Tim and Trevor Page were affiliates of EnviroTechnologies. Tim and Trevor Page did not sell EnviroTechnologies' stock pursuant to an effective registration statement and no valid exemption from registration existed. Further, Tim and Trevor Page did not meet or comply with the safe harbor conditions set forth in SEC Rule 144, which, among other things, provide a limitation for the amount of shares an affiliate can legally sell in order to qualify for the safe harbor, and therefore were not entitled to its protections.

### BIOHEMP SCHEME TO DEFRAUD

#### Company Control

54.     In early 2018, Tim and Trevor Page took control, directly or indirectly, of BioHemp. For example, Trevor Page called Person C and asked him to incorporate a company to hold BioHemp's stock. Person C agreed and incorporated FJ Investments. FJ Investments then purchased 18,000,000 restricted shares of BioHemp stock—the majority of the company's outstanding shares. FJ Investments received the shares without FJ Investments or anyone else providing consideration for those shares, and FJ Investments was holding the shares on Tim Page's and Trevor Page's behalf.

55.     Shortly thereafter, Tim and Trevor Page arranged via defendant FJ Investments to install a new BioHemp Chief Executive Officer ("Person D"). Person D was an associate of Tim

18

and Trevor Page and, like Person C, took direction (through BioHemp's largest shareholder, FJ Investments), from Tim and Trevor Page. For example:

i.   On various dates in 2017 through 2020, Tim and Trevor Page arranged to pay Person D, with whom the Pages were coordinating, more than $100,000. (As described in Paragraph 81, below, Person D also served as the chief executive officer of Cyberfort.)

ii.  In or about June 2018, Person D paid a vendor for BioHemp with a credit card issued in Janan Page's name.

iii. In or about October 2018, Person C and Person D caused BioHemp to execute a 1-for-1,000 reverse split of its stock (1 share is exchanged for every 1,000 shares outstanding), which had the effect of (a) dramatically reducing the company's existing shareholders (because any shareholder holding less than 1,000 shares would receive a payout instead of holding a fraction of a share); and (b) reducing the "float" (the company's purportedly unrestricted stock that was available for trading) to approximately 11,000 shares. This was a first step toward enabling Tim and Trevor Page to control virtually the entirety of the float.

iv.  In or about March 2019, Person D caused BioHemp to issue 25,000,000 restricted shares to FJ Investments, which was a front or "nominee" company controlled by Tim and Trevor Page. BioHemp announced that the issuance was "in preparation of a pending acquisition and investment agreement." In actuality, Tim and Trevor Page arranged for BioHemp to issue FJ Investments 25,000,000 shares to increase their control over the company. Indeed, as of March 2019 and as a result of BioHemp's corporate actions, Tim and Trevor

Page controlled 99.99% of BioHemp's outstanding stock through FJ Investments.

56.     Between May and July 2019, Tim and Trevor Page, through defendants Wellesley, Porrima, and Emergent, obtained 3,818,813 shares of purportedly unrestricted BioHemp shares, which represented 99.7% of the float (in light of the prior 1-for-1,000 reverse stock split).

57.     Tim and Trevor Page acquired these 3,818,813 purportedly unrestricted shares via their nominees—Wellesley, Porrima and Emergent—from a single payment made in 2016. Specifically, in or about September 2016, an entity wired $42,000 to the trust account for the law firm representing BioHemp. In exchange for this payment, BioHemp issued a promissory note dated September 19, 2016 to the entity (the promissory note is referred to herein as the "BioHemp Promissory Note"). Between March and July 2019, in separate transactions, Wellesley, Porrima and Emergent, purportedly each acquired their BioHemp shares following nearly identical steps:

     i.  First, each of the three defendants purportedly purchased an interest in the BioHemp Promissory Note. The combined interests totaled the full face value of the note.

     ii.  Second, each of the three defendants presented BioHemp with a letter demanding payment on their acquired interest in the BioHemp Promissory Note.

     iii.  Third, Person D (or, in one instance, his successor chief executive officer) signed a board resolution settling the debt by authorizing the issuance of shares in lieu of payment.

iv.  <u>Fourth</u>, in each instance, Trevor Page arranged for Person B to write opinion letters attesting that the transfer agent could issue share certificates without restrictive legends for the BioHemp shares acquired by Wellesley, Porrima and Emergent. Specifically, Person B's letters attested that these entities were not affiliates of BioHemp. The opinion letters were false and misleading in that Wellesley, Porrima and Emergent were nominee entities for Tim and Trevor Page, who were affiliates of BioHemp by virtue of (a) their control over the company's operations; or (b) their control over the company's shares.

### Illegal Sale of BioHemp Stock

58.     After obtaining the purportedly unrestricted shares in the names of Wellesley, Porrima and Emergent, Tim and Trevor Page arranged to deposit the stock with offshore brokerage firms and directly or indirectly sold over 3 million shares of BioHemp stock to retail investors.

59.     To generate interest in their shares, Tim Page hired the Boiler Room Operator to tout BioHemp through his boiler room. For example, in or about June 2019, Tim Page caused Emergent to pay the Boiler Room Operator approximately $122,644 and, at or about the same time, Tim Page caused Emergent to buy a watch costing approximately $262,000 for the Boiler Room Operator.

60.     Tim and Trevor Page knew, or were reckless in not knowing, that the Boiler Room Operator would tout BioHemp's shares as a good investment opportunity without disclosing that Tim Page had hired the Boiler Room Operator, and without disclosing that the control persons of BioHemp intended to sell their shares to the unsuspecting investors solicited by the Boiler Room Operator and his team.

61.    Tim Page, Trevor Page, Wellesley, Emergent, and Porrima knew, or were reckless in not knowing, that their shares were legally restricted from resale. Tim Page, Trevor Page, Wellesley, Emergent, and Porrima schemed to defraud the company's transfer agent and the market by concealing their control over BioHemp, including by operating secretly through FJ Investments, in order to conceal their status as affiliates of the company.

62.    Tim Page and Trevor Page received, directly or indirectly, approximately $3.6 million in illegal proceeds as a result of fraudulently selling BioHemp stock.

## DEFENDANTS' BIOHEMP REGISTRATION VIOLATIONS

63.    Tim Page, Trevor Page, Wellesley, Emergent, and Porrima's BioHemp stock sales involved an underwriter. For example, the Pages, Emergent, Wellesley and Porrima were underwriters because they were affiliates who acquired BioHemp stock with the intent to distribute it. Further, the foreign brokers and foreign account operators who sold stock on these defendants' behalf also acted as underwriters because the foreign brokers and foreign account operators were selling shares for affiliates in connection with the distribution of the securities to the public. Accordingly, the sales were required to be registered or otherwise compliant with the conditions set forth in SEC Rule 144, because Tim and Trevor Page were affiliates of BioHemp. Tim Page, Trevor Page, Wellesley, Emergent, and Porrima did not sell BioHemp's stock pursuant to an effective registration statement and no valid exemption from registration existed. Further, Tim Page, Trevor Page, Wellesley, Emergent, and Porrima did not comply with the safe harbor conditions set forth in SEC Rule 144.

## DEFENDANTS' BIOHEMP DISCLOSURE VIOLATIONS

64.    BioHemp had a voting class of equity securities registered under Section 12 of the Exchange Act. In March 2019, BioHemp issued 25,000,000 shares to FJ Investments, which

held those shares for Tim and Trevor Page. At that point, Tim and Trevor Page controlled approximately 99.9% of BioHemp's outstanding stock through FJ Investments.

65.    Because of the Pages' exclusive control over the shares acquired by FJ Investments, the Pages had investment power within the meaning of Rule 13d-3(a) over these BioHemp shares and, therefore, had "acquired" beneficial ownership of those shares within the meaning of Rule 13d-5(a). Accordingly, the Pages were required to file a statement of beneficial ownership within ten days of acquiring that beneficial ownership. The Pages, however, failed to file any such statement.

66.    Similarly, FJ Investments was required to file its own statement of beneficial ownership within ten days of acquiring that beneficial ownership because it was the beneficial owner of more than 5% of BioHemp's stock. FJ Investments, however, failed to file a statement of beneficial ownership.

## LINK SCHEME TO DEFRAUD

### Control over Link

67.    From at least February 2016 through February 2018, Tim and Trevor Page controlled Link in a similar way to EnviroTechnologies. For example, Person A served as a consultant of Link as he did for EnviroTechnologies (arranging for, among other things, the issuer to file paperwork with OTC Markets on Tim Page and Trevor Page's behalf).

68.    Tim and Trevor Page also controlled Link's stock. During a conversation surreptitiously recorded by a witness who was cooperating with an FBI investigation on or about February 13, 2018, Tim Page explained that: (a) Link had 285 million outstanding shares of which 175 million were restricted (meaning there were approximately 110 million shares that were purportedly unrestricted), and (b) only "about 1.8 million is away from us," (meaning that

Tim and Trevor Page controlled approximately 108 million of the approximately 110 million purportedly unrestricted shares).

69.     Tim and Trevor Page knew, or were reckless in not knowing, that they were affiliates of Link and that their stock was legally restricted from resale.

### Illegal Sale of Link Stock: 2016 and 2017

70.     In or about February 2016, Tim and Trevor Page arranged for the deposit of 15,000,000 Link shares into a foreign account in the name of Norfolk Heights Ltd. Tim and Trevor Page also hired the Boiler Room Operator to promote Link shares to generate demand among investors. From approximately October 2016 through April 2017, through Norfolk Heights Ltd., Tim and Trevor Page sold 2.3 million shares of Link, generating proceeds of at least $1.9 million.

71.     Of the $1.9 million in Link proceeds, Tim and Trevor Page caused foreign trading accounts to transfer at least $762,500 to personal bank accounts held in the name of Tim Page and/or Janan Page, and $30,000 to Ticino.

72.     Tim and Trevor Page also arranged for additional funds to be paid to the Boiler Room Operator from the Link proceeds generated through Norfolk Heights Ltd.'s accounts. Specifically, Norfolk Heights Ltd. wired 12 payments to bank accounts controlled by the Boiler Room Operator totaling over $772,000 between October 2016 and February 2018. Tim Page and Trevor Page knew, or were reckless in not knowing, that the Boiler Room Operator and his team would tout Link's shares as a good investment opportunity without disclosing the fact that Tim Page had hired the Boiler Room Operator and that the control persons of Link intended to sell their shares to unsuspecting investors solicited by the Boiler Room Operator and his team.

24

73.      Tim Page and Trevor Page knew, or were reckless in not knowing, that their shares were legally restricted from resale. Tim Page and Trevor Page schemed to defraud the company's transfer agent and the market by concealing their control over Link in order to avoid detection as affiliates of the company.

**Illegal Sale of Link Stock: 2018**

74.      Despite selling millions of Link shares in 2016 and 2017, Tim Page and Trevor Page held additional Link shares that they sought to sell in 2018. During a conversation surreptitiously recorded by a witness who was cooperating with an FBI investigation on or about February 13, 2018, Tim Page acknowledged that he had used a boiler room to promote Link in the past, but that the effect of the boiler room was waning. During that same recorded conversation, Tim Page and the witness discussed that they could arrange for the witness to use a network of brokers to buy Link stock on behalf of unsuspecting brokerage customers in exchange for a 20 to 25% kickback.

75.      On or about February 15, 2018, during a surreptitiously recorded call between a witness who was cooperating with an FBI investigation and Tim Page and Trevor Page, Tim Page explained that Trevor Page would coordinate their trading with a Swiss-based broker.

76.      On or about February 15 and February 16, 2018, Tim Page and Trevor Page coordinated cross trades with a witness who was cooperating with an FBI investigation.

77.      On or about February 23, 2018, during a surreptitiously recorded call by a witness who was cooperating with an FBI investigation and Tim Page, Tim Page reminisced about having engaged in the coordinated cross trades on February 15 and 16, 2018 and explained that he intended to pay the kickback from his personal account.

78.     On or about February 27, 2018 and March 1, 2018, Tim and Trevor Page coordinated additional cross trades with a witness who was cooperating with an FBI investigation.

79.     During the same February 23, 2018 recorded conversation, Tim Page explained that he and Trevor Page had been placing trades to support the price of Link at \$.11 per share until the witness could arrange more purchases. Tim Page and Trevor Page placed these trades to artificially raise the price per share of Link's stock for the purpose of inducing the purchase or sale of Link stock by others. Specifically, Tim Page and Trevor Page manipulated the price per share of Link to defraud market participants into believing that the value of Link stock was \$.11 per share.

## CYBERFORT SCHEME TO DEFRAUD

80.     As they had done when selling shares of EnviroTechnologies, BioHemp, and Link, Tim and Trevor Page fraudulently sold shares of Cyberfort. Tim and Trevor Page: (a) had the power to control Cyberfort; (b) hired the Boiler Room Operator to tout Cyberfort's stock; and (c) sold more than a million of shares of Cyberfort stock through foreign accounts in order to conceal their control.

81.     Tim Page and Trevor Page controlled Cyberfort through Person D. On various dates in 2017 through 2020, Tim and Trevor Page arranged to pay Person D, with whom the Pages were coordinating in both Cyberfort and BioHemp, more than \$100,000.

82.     Starting in early 2018, Tim Page and Trevor Page retained the Boiler Room Operator, whom they had engaged to push the stock of EnviroTechnologies, BioHemp, and Link. Tim Page and Trevor Page knew, or were reckless in not knowing, that the Boiler Room Operator and his team would tout Cyberfort's shares as a good investment opportunity without

26

disclosing that Tim Page had hired the Boiler Room Operator and that the persons in control of Cyberfort intended to sell their shares to the unsuspecting investors solicited by the Boiler Room Operator.

83.     In or about June 2018, Tim and Trevor Page used their nominee, Ticino, to deposit 1,250,000 shares of Cyberfort into a foreign brokerage account.

84.     Between approximately June 19, 2018 and September 10, 2018, Tim Page and Trevor Page, though Ticino, sold their 1,250,000 shares while the boiler room they had hired aggressively touted the company's stock to retail investors, including elderly investors. Similarly, in October 2018, the Pages deposited into a foreign brokerage account the additional 1,250,000 shares of Cyberfort they had obtained through Emergent in September 2018. They then directed the sale of about 20,000 of these shares into the United States securities markets in November and December 2018. In total, the Pages sold at least 1.27 million shares of Cyberfort for illegal proceeds of at least $1.9 million.

85.     Tim Page and Trevor Page knew, or were reckless in not knowing, that the Boiler Room Operator would tout Cyberfort shares as a good investment opportunity without disclosing that Tim Page had hired the boiler room, and without disclosing that the persons who controlled the company intended to sell their shares to the unsuspecting investors solicited by the boiler room.

86.     Tim Page, Trevor Page, and Ticino knew, or were reckless in not knowing, that their shares were legally restricted from resale. Tim Page, Trevor Page, and Ticino schemed to defraud the company's transfer agent and the market by concealing their control over Cyberfort in order to conceal their status as affiliates of the company.

## MONETARY TRANSFERS TO JANAN PAGE

87.     Janan Page received investor funds derived from the unlawful acts, practices and scheme of Tim Page and Trevor Page, as described in this Complaint.  For example, during October and November 2016, Tim Page caused a foreign account to transfer approximately $410,000 to a bank account at least partially controlled by Janan Page (this $410,000 was part of the approximately $762,000 that Tim Page arranged to be transferred from foreign brokerage accounts to accounts held in his name and/or Janan Page's name).  Janan Page did not provide consideration for these proceeds.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a)(1) and (3) of the Securities Act)
### (All Defendants)

88.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

89.     By reason of the conduct described above, the Defendants, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

90.     By reason of the conduct described above, the Defendants violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)
### (All Defendants)

91.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

92.     By reason of the conduct described above, the Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

93.     By reason of the conduct described above, the Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
#### (Violations of Sections 5(a) and 5(c) of the Securities Act)
#### (Timothy Page, Trevor Page, Wellesley, Porrima, and Emergent)

94.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

95.     By reason of the conduct described above, Timothy Page, Trevor Page, Wellesley, Porrima, and Emergent, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of EnviroTechnologies and

29

BioHemp, as to which no registration statement has been filed and for which no exemption from registration has been available.

96.     As a result, Timothy Page, Trevor Page, Wellesley, Porrima, and Emergent violated Securities Act Sections 5(a) and (c) [15 U.S.C. §§77e(a) and (c)].

## FOURTH CLAIM FOR RELIEF
## MARKET MANIPULATION
### (Violations of Section 9(a)(2) of the Exchange Act)
### (Timothy Page and Trevor Page)

97.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

98.     Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(1)-(2)] makes it unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, to effect a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

99.     By engaging in the conduct described above, Timothy Page and Trevor Page violated Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)].

## FIFTH CLAIM FOR RELIEF
## FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
### (Violation of Section 13(d)(1) and Rule 13d-1)
### (Timothy Page, Trevor Page, and FJ Investments)

100.    Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

101.    During the period subject to this Complaint, the stock of BioHemp was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

102. During the period described in this Complaint, BioHemp had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

103. By reason of the conduct described in this Complaint, defendants Timothy Page, Trevor Page, and FJ Investments, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of BioHemp equity securities, failed to file statements with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquired such shares.

104. As a result, Timothy Page, Trevor Page, and FJ Investments violated and, unless enjoined, will continue to violate Section 13(d)(1) of the Exchange Act [15 U.S.C. §78m(d)(1)] and Rule 13d-1 thereunder [17 C.F.R. §240.13d-1].

**SIXTH CLAIM FOR RELIEF**
**OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**
**(Janan Page)**

105. Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

106. Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

107. The Relief Defendant has received investor funds derived from the unlawful acts, practices and scheme of the Defendants under circumstances dictating that, in equity and good conscience, she should not be allowed to retain such funds.

108. As a result, the Relief Defendant is liable for unjust enrichment and should be required to return her ill-gotten gains, in an amount to be determined by the Court. The Court

should also impose a constructive trust on property in the possession of the Relief Defendant that is traceable to the Defendants' wrongful acts.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.        Permanently restrain defendants Timothy and Trevor Page, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§77e(a), (c); 77q(1) and (3)], and Sections 9(a)(2), 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§78j(b), 78i(a), 78m(d)(1)], and Rules 10b-5(a) and (c) and 13d-1 thereunder [17 C.F.R. §240.10b-5; §240.13d-1].

B.        Permanently restrain defendants Wellesley, Porrima and Emergent, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§77e(a), (c); 77q(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5].

C.        Permanently restrain defendant Ticino, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §77q(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5].

D.      Permanently restrain defendant FJ Investments, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §77q(1) and (3)], and Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d)(1)], and Rules 10b-5(a) and (c) and 13d-1 thereunder [17 C.F.R. §240.10b-5; §240.13d-1].

E.      Order the Defendants and Relief Defendant to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)].

F.      Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

G.      Enter an order barring Trevor Page from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

H.      Enter an order enjoining Timothy Page and Trevor Page from directly or indirectly, including, but not limited to, through an entity owned or controlled by Timothy Page or Trevor Page, participating in the issuance, purchase, offer or sale of any security; provided, however, that such injunction shall not prevent Timothy Page or Trevor Page from purchasing or selling securities listed on a national securities exchange for their own personal accounts.

I.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

J.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED: September 23, 2021


                Respectfully submitted,


                /s/ Alicia Reed
                Alicia Reed
                Amy Gwiazda*
                Eric Forni*
                Kathleen Shields*

                Attorneys for the Plaintiff
                SECURITIES AND EXCHANGE COMMISSION
                Boston Regional Office
                33 Arch St., 24th Floor
                Boston, MA 02110


                *Not admitted in the U.S. District Court for the
                Eastern District of New York