UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Civil Action No. 21-cv-** |
| **Plaintiff,** | |
| **v.** | |
| **TIMOTHY PAGE, TREVOR PAGE, TICINO CAPITAL LIMITED, WELLESLEY HOLDINGS LIMITED, PORRIMA LIMITED, EMERGENT INVESTMENTS COMPANY, and FJ INVESTMENTS INTERNATIONAL INC.,** | |
| **Defendants,** | |
| **JANAN PAGE,** | |
| **Relief Defendant.** | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN**
<u>**ORDER FREEZING AND REPATRIATING ASSETS**</u>

Alicia Reed (NY Bar No. 4913596)
Kathleen Burdette Shields (Mass Bar No. 637438)
Eric A. Forni (Mass Bar No. 669685)
Amy Gwiazda (Mass Bar No.663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct);
(617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
shieldska@sec.gov; fornie@sec.gov

# TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                                       1

STATEMENT OF FACTS                                                                          2

I.     Statutory Framework Concerning the Sale of Securities: Control Persons,
       Restrictions on Sales, and Issuer Disclosure Requirements                            2

II.    The Pages Illegally Sold the Stock of Numerous Companies                             4

       A.     Overview of the Pages' Conduct                                                4

       B.     The EnviroTechnologies Scheme to Defraud                                      7

       C.     The BioHemp Scheme to Defraud                                                 9

       D.     The Pages' Unlawful Cross-Trade Schemes                                       11

ARGUMENT                                                                                    12

I.     The Commission is Likely to Succeed on its Claims that the Pages and the
       Page Nominees Violated the Antifraud Provisions of the Securities Act and
       Exchange Act.                                                                        12

       A.     The Pages and the Page Nominees Engaged in a Fraudulent Scheme.              14

       B.     The Pages and the Page Nominees Acted with Scienter.                         14

       C.     The Pages' and the Page Nominees' Fraud was "In Connection With"
              the Purchase or Sale of Securities.                                          16

II.    The Commission Is Likely to Succeed on its Claims That the Pages, Wellesley,
       Porrima and Emergent Violated the Registration Provisions of the
       Securities Act.                                                                      17

III.   The Commission Is Likely to Succeed on its Claims that the Pages Violated
       Section 9(a)(2) of the Exchange Act                                                  19

IV.    The Commission Is Likely to Succeed on its Claims that the Pages and FJ
       Investments Violated Section 13(d) of the Exchange Act.                              20

V.     The Court Should Freeze Assets Belonging to the Defendants and the Relief
       Defendant to Prevent Their Dissipation.                                             21

VI.    The Court Should Enter an Order to Repatriate Assets From Foreign
       Jurisdictions.                                                                       22

CONCLUSION                                                                                  23

Plaintiff Securities and Exchange Commission (the "Commission"), submits this memorandum of law, as well as the Declaration of Trevor Donelan ("Donelan Dec.") and its six exhibits, in support of its motion for an order freezing and repatriating assets belonging to defendants Timothy Page, Trevor Page, Ticino Capital Limited ("Ticino"), Wellesley Holdings Limited ("Wellesley"), Porrima Limited ("Porrima"), Emergent Investments Company ("Emergent") and FJ Investments International Inc. ("FJ Investments") (collectively "Defendants") as well as assets belonging to Relief Defendant Janan Page.

## PRELIMINARY STATEMENT

This case concerns a fraudulent scheme in which Timothy and Trevor Page ("the Pages"), acting on their own and through various entities they controlled, schemed fraudulently to sell the stock of various publicly traded companies they also controlled, including the stock of EnviroTechnologies International, Inc. ("EnviroTechnologies"), BioHemp International, Inc. ("BioHemp"), Link Reservations, Inc. ("Link") and Cyberfort Software Inc. ("Cyberfort"). Their sales victimized investors in the public United States securities markets. The Pages disguised their control over the stock of these companies by using a layer of nominee corporations (including defendants Ticino, Wellesley, Porrima, Emergent, and FJ Investments) (collectively the "Page Nominees") to transfer and sell the stock they controlled into the market, in contravention of the registration and disclosure requirements imposed by the federal securities laws. The Pages also engaged boiler rooms (*i.e.*, call center operations designed to lure investors to purchase stock, often using high-pressure sales tactics) to generate artificial demand for their stock by making misleading statements to investors. And when the boiler room's promotions began to fade, the Pages manipulated the market for their remaining shares by paying kickbacks to a broker who promised to engage in illegal cross-trades on their behalf. From at least 2016 to

July 2019 (the "relevant period"), the Pages orchestrated the coordinated dumping of shares of at least 4 public companies, for net trading proceeds of about $12 million.

The Commission seeks an asset freeze against the Pages, the companies they control, and Janan Page (who is the wife of Timothy Page and the mother of Trevor Page and who received proceeds of the Pages' fraud). To date, the Commission has been able to identify at least $12 million in illicit trading proceeds received by the Pages and the Page Nominees as a result of the trading described in the Complaint.  *See* Declaration of Trevor Donelan ("Donelan Dec.") ¶21. There is a likelihood that these assets will be dissipated on the filing of this case (if they have not been already), and the Commission seeks an asset freeze to ensure that these funds can be collected for distribution to hundreds of investor victims.  The Commission is likely to succeed on the merits of showing that the Pages and the Page Nominees repeatedly violated the federal securities laws.

## STATEMENT OF FACTS

**I.      Statutory Framework Concerning the Sale of Securities: Control Persons, Restrictions on Sales, and Issuer Disclosure Requirements**

Stock held by public company control persons cannot generally be offered or sold to the public without being first registered with the Commission or unless its owners comply with various public disclosure requirements and limits on the amount of stock they can sell.  These legal requirements create market transparency by giving investors access to material information, including information identifying: from whom the investors would be buying stock, the control persons of the company, and what those control persons are doing with their own stock.

Before stock can be sold to the public, the person issuing or selling the stock must either (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act; (b) rely on an exemption from registration; or (c) comply with the sale conditions outlined in

Commission Rule 144, which provides a safe harbor for selling unregistered stock. *See* 15 U.S.C. §§77d, 77e; 17 C.F.R. §230.144. Importantly, even if a public company files a registration statement to offer and issue stock to its investors, those investors *must* comply with the registration, exemption, or safe harbor rules before distributing (selling) that stock to other investors. *See e.g.* §230.144 (preamble).

"Restricted stock" is stock of a publicly traded company (also known as an "issuer") acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission. Stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). *See* 15 U.S.C. §77e. A registration statement describes an issuer's business operations, financial condition, risk factors, and management. *See* 15 U.S.C. §77g. It also discloses any person or group who beneficially owns more than 5% of the company's securities.

An "affiliate" of an issuer is a person or group that, "directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer" (*i.e.*, a control group). 17 C.F.R. §230.144(a)(1). Typical affiliates are officers, directors and controlling shareholders. For purposes of this memorandum, an "affiliate" is synonymous with a "control group." *See id.* Control groups or control persons, like the Pages, are subject to strict limitations on the amount of stock they can sell, and have specific disclosure obligations. *See generally* 17 C.F.R. §230.144. In short, control persons cannot secretly dump vast quantities of stock into the securities markets – as the Pages did. *See id.*

"Unrestricted stock" may legally be offered and sold in the public securities market by a non-affiliate, ordinarily after being registered via a registration statement. Registration

3

statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register later offers and sales by the same or other parties.  *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).  If a control person buys shares in the company s/he controls, those shares are restricted and ordinarily must be registered before a bulk sale to public investors.

In addition, certain investors must disclose their control of more than 5% of an issuer's outstanding shares.  *See* 15 U.S.C. §78m.  Public companies that are required to file periodic reports with the Commission must accurately disclose shareholders who own more than 5% of the company's outstanding shares.  *See* 15 U.S.C. §78m(d)(1).

## II.     The Pages Illegally Sold the Stock of Numerous Companies.

### A.     Overview of the Pages' Conduct

Timothy Page is a securities law recidivist who has been involved in penny stock schemes for years.  He was charged by the Commission in two actions filed in 2007 and 2009 for distributing unregistered securities in connection with several stock offerings, as well as acting as an unregistered broker-dealer in the 2009 matter.  *See SEC v. Phillip W. Offill, Jr., et al.*, No. 07-cv-01643 (N.D. Tex.), filed Sept. 26, 2007; *SEC v. Connectajet.com, Inc., et al.*, No. 09-cv-01742 (N.D. Tex.), filed Sept. 18, 2009.  In 2012, the court granted summary judgment for the Commission in the *Offill* matter, and Timothy Page settled the *Connectajet.com* matter.  *See Offill*, No. 07-cv-01643, Dkt. No. 159 (finding that Page illegally sold securities while hiring others to promote the stock of the company he sold); *Connectajet*, No. 09-cv-01742, Dkt. Nos. 89-91 (entry of final judgment against Page in a case in which he was alleged to have illegally sold unregistered shares of stock).  The relief against Timothy Page in the two matters included injunctions against future violations of Sections 5(a) and (c) of the Securities Act and Section

4

15(a)(1) of the Exchange Act., and a penny stock bar (which prohibits, among other things, engaging in activities with an issuer for purposes of issuing, trading, or inducing the purchase or sale of penny stock).  *See Offill*, No. 07-cv-01643, Dkt. No. 180; *Connectajet*, No. 09-cv-01742, Dkt. No. 91.  The two judgments also ordered Timothy Page to pay a total of $2,773,489 in disgorgement (plus prejudgment interest) and $770,000 in civil penalties, but Timothy Page and Janan Page fled to Lugano, Switzerland and sheltered his assets shortly before the final judgments were entered, only paying about $100,000.  Timothy Page currently has been found to be in contempt for his violation of the *Connectajet.com* final judgment.  *See Connectajet*, No. 09-cv-01742, Dkt. No. 129.

Trevor Page, who is Timothy Page's son, worked for a United States brokerage firm from August 2011 through January 2012, when his employment was terminated.  *See* Donelan Dec., ¶10, Ex. A.  He passed the Series 7 exam, administered by the Financial Industry Regulatory Authority, which tests basic topics in the securities industry, including the federal securities laws applicable to registration and distribution of stock.

Notwithstanding the judgments against Timothy Page, between at least 2016 and May 2019, the Pages illegally sold at least $12 million of stock in companies they controlled to unsuspecting investors who were ignorant as to the true ownership of the stock they were buying. *See* Complaint ("Comp."), ¶1, 42, 63, 71; Donelan Dec., ¶¶11-14, 21.  The Pages typically controlled virtually all of the stock available for trading (the "float") for each company involved in their scheme, but the Pages' deceptive acts made it appear that the shares were owned by multiple, unaffiliated entities.  *See e.g.,* Comp., ¶40, 57; Donelan Dec., ¶¶25, 39-40.  In truth, those entities -- a network of foreign companies, including defendants Ticino, Wellesley, Porrima, Emergent, as well as the U.S.-based FJ Investments -- were nothing more than vehicles

to hold and sell stock for the Pages without detection.  *See* Comp., ¶¶9-13; Donelan Dec., ¶¶36, 40.

The Pages used these entities' bank and brokerage accounts, as well as brokerage accounts held by service providers who specialized in securities fraud, to sell stock they controlled illegally into the U.S. public markets.  *See e.g.* Comp., ¶¶41, 59; Donelan Dec., ¶21, 33-34, 40, 42.  One of the service providers the Pages used was sued previously by the Commission for running an illegal trading platform that allowed public company control persons (like the Pages) to disguise their ownership of stock, and to dump that stock into the market.  *See SEC v. Bajic et al.*, No. 20-cv-007-LGS (S.D.N.Y.), filed Jan. 2, 2020.  Judgments have entered against most of the defendants in that matter.  *See id.*, Dkt. Nos. 113-17, 159, 215, 218-19, 237, 240-42, 248.  Often, the Pages' sales took place at the same time as promotional campaigns they funded that encouraged investors to purchase those shares—thereby driving up the price and volume of the stock to the Pages' benefit and the investors' detriment.  *See e.g.* Comp., ¶¶49-50, 60-61; Donelan Dec., ¶¶32, 43.  In at least two instances, the Pages also engaged in manipulative trading to prop up the price of the remaining securities they controlled and wished to sell.  *See* Comp., ¶¶45-48, 75-80; *e.g.*, Donelan Dec., ¶¶27-28, 44-49.

At no time did the Pages register their offers or sales of stock with the Commission, disclose accurate information about their control over the companies, or comply with limitations on the sale of stock by company "affiliates" like themselves, as they knew they was required to do by the federal securities laws.  *See* Comp., ¶¶54, 64; *e.g.*, Donelan Dec., ¶¶20.a, b., 33-34, 42.

The Pages' conduct relating to the stock of two companies, EnviroTechnologies and BioHemp is detailed below, although their scheme followed a similar pattern for additional companies, like Link and Cyberfort.  *See* Comp., ¶¶68-87.  The Pages' repeated conduct,

involving many securities over the span of years, demonstrates the propriety of the relief sought in this motion.

### B.     The EnviroTechnologies Scheme to Defraud

From 2016 through 2018, the Pages concealed their control over EnviroTechnologies' stock, and sold that stock without registering the sales or complying with legally mandated sale limitations, while concealing from prospective purchasers that EnviroTechnologies' stock was being sold, in bulk, by the people who controlled the company.  *See* Comp., ¶28.  The Pages secretly controlled EnviroTechnologies by: (a) engaging an officer of EnviroTechnologies ("Person C") to be their company insider; (b) providing significant funding to the company; and (c) controlling a significant percentage of the company's stock.  *See id.*, ¶29.

First, the Pages recruited Person C to participate in their scheme to sell EnviroTechnologies shares by convincing Person C to merge his private company into a shell company held by another of their associates.  *See* Donelan Dec., ¶20.c, Ex. B at 1-2 (describing the merger transaction).  As a result of this transaction, Person C became an officer of EnviroTechnologies and it was discussed that the Pages and their partner would benefit by controlling EnviroTechnologies' unrestricted stock and selling it.  *See id.*, ¶30; Ex. B at 2 (listing Person C as an officer of EnviroTechnologies).

Second, Timothy Page was a significant source of funding for EnviroTechnologies between March 2017 and May 2019 but he concealed that fact by funneling money from accounts he controlled, including Ticino and Emergent accounts, to Person C.  Person C then transferred nearly $80,000 of Timothy Page's money to EnviroTechnologies.  *See* Comp., ¶32; Donelan Dec., ¶29.  Timothy Page and Person C then papered over these monetary transfers with fraudulent promissory notes.  *See* Comp., ¶33; Donelan Dec., ¶29.

Third, the Pages, working with their partner, came to control a significant percentage of EnviroTechnologies' purportedly unrestricted stock. The Pages and their partner orchestrated a series of transactions by which five foreign entities that were controlled directly or indirectly by the Pages, including Ticino, acquired a total of 50,000,000 shares of Envirotechnologies' common stock between October 2016 and May 2017. *See* Comp., ¶¶34-36; Donelan Dec., ¶25. By January 2017, the Pages controlled – through 4 of these 5 foreign entities – 100% of EnviroTechnologies purportedly unrestricted stock. *See* Comp., ¶40; Donelan Dec., ¶25. Trevor Page also worked with EnviroTechnologies' counsel to obtain false and misleading attorney opinion letters that would authorize the common stock controlled by the Pages to be issued without a restricted legend, thus enabling the shares to be deposited with a broker and sold to investors in the public market. *See* Comp., ¶¶36-39; Donelan Dec., ¶31, Ex. C.

Having consolidated their control of EnviroTechnologies' common stock, the Pages then began selling that stock into the market. They sold their shares in two waves – from February to June 2017 and from February to May 2018. In the first wave, the Pages directly or indirectly sold about 3.9 million shares of EnviroTechnologies stock for proceeds of about $3.7 million. *See* Comp., ¶42; Donelan Dec., ¶¶21, 26, 33. In the second wave, the Pages used brokerage accounts in the name of Janan Page to enter small and manipulative buy orders to support the price of EnviroTechnolgies shares and create the appearance of market demand so that they could sell the remaining shares they held. *See* Comp., ¶¶45-48; Donelan Dec., ¶¶27-28. In both waves of sales, Timothy Page also hired a boiler room to generate demand for EnviroTechnologies stock, knowing that the boiler room personnel would promote EnviroTechnologies as a good investment opportunity without disclosing that the persons controlling the company intended to sell their shares to the investors those personnel were

8

soliciting.  *See* Comp., ¶¶43, 49-50; Donelan Dec., ¶32.  Overall, the Pages' sales of EnviroTechnologies' stock generated combined trading proceeds of more than $4.6 million.  *See* Donelan Dec., ¶21.

The Pages' were affiliates of EnviroTechnologies and their sales of EnviroTechnologies' stock were not registered.  Neither the Pages nor their associates filed registration statements with the Commission.  *See* Comp., ¶54; Donelan Dec., ¶20.a.  Further, they sold well more than 1% of EnviroTechnologies' stock within a three-month period and thus did not comply with safe harbor conditions that could have exempted their sales from registration.  *See* Comp., ¶54; Donelan Dec., ¶33-34.

## C.      The BioHemp Scheme to Defraud

From 2018 through 2019, the Pages concealed their control over BioHemp's stock, and sold that stock without registering the sales or complying with legally mandated sale limitations, while concealing from prospective purchasers that BioHemp's stock was being sold, in bulk, by the people who controlled the company.  *See* Comp., ¶¶55-63.  In about February 2018, Tim and Trevor Page took control, directly or indirectly, of BioHemp.  Person C, whom the Pages had recruited as part of their EnviroTechnologies scheme, incorporated defendant FJ Investments in February 2018, and purportedly purchased 18,000,000 restricted shares of BioHemp stock—the majority of the company's outstanding shares—through FJ Investments.  *See* Comp., ¶55; Donelan Dec., ¶35.  FJ Investments received the shares without FJ Investments or anyone else providing consideration for those shares, and FJ Investments held the shares on the Pages' behalf.  *See* Donelan Dec., ¶36.  Using its authority as the majority shareholder, FJ Investments then installed a new BioHemp Chief Executive Officer ("Person D") who, like Person C, took direction from the Pages.  *See* Comp., ¶56; Donelan Dec., ¶37.

Having obtained effective control of BioHemp's management, the Pages then began to coordinate transactions that solidified their control over BioHemp's stock.  By causing Person C and Person D to execute a reverse split of BioHemp's stock that replaced every 1,000 outstanding shares for 1 share, the Pages were able to reduce the "float" (the amount of BioHemp's purportedly unrestricted stock that was available for trading in the public markets) to about 11,000 shares.  *See* Comp., ¶56.iii; Donelan Dec., ¶38.  They then got Person D to issue an additional 25,000,000 restricted shares to FJ Investments.  *See* Comp., ¶56.iv; Donelan Dec., ¶39.  At that time, the Pages controlled 99.99% of BioHemp's outstanding stock.  *See id*.

Then, between May and July 2019, the Pages, through defendants Wellesley, Porrima and Emergent, obtained a total of 3,818,813 shares of purportedly unrestricted BioHemp shares, which represented 99.7% of the float (in light of the prior 1-for-1,000 reverse stock split).  *See* Comp., ¶¶57-58; Donelan Dec., ¶40.   Wellesley, Porrima and Emergent obtained these shares by purportedly purchasing interests in a promissory note, which Person D, at the direction of the Pages, agreed to settle by issuing stock to them in lieu of paying the promissory note.  *See* Comp., ¶58; Donelan Dec., ¶40, Exs. D, E.  Trevor Page again worked with an attorney to write opinion letters falsely attesting that the transfer agent could issue share certificates without restrictive legends for these BioHemp shares.  *See* Comp., ¶58.iv; Donelan Dec., ¶41, Ex. F. Specifically, the opinion letters attested that these entities were not affiliates of BioHemp, but Wellesley, Porrima and Emergent were actually nominee entities for the Pages, who were affiliates of BioHemp by virtue of their control over the company's operations or the company's shares.  *See e.g. id.,* Ex. F at 1, 2.

After obtaining unrestricted shares in the names of Wellesley, Porrima and Emergent, the Pages arranged to deposit the stock with offshore brokerage firms and directly or indirectly sold

over 3 million shares of BioHemp stock to retail investors.  *See* Comp., ¶59; Donelan Dec., ¶42. To generate interest in their shares, Tim Page hired the same boiler room that he had used to promote EnviroTechnologies to tout BioHemp and paid him compensation valued over $384,000.  *See* Comp., ¶60; Donelan Dec., ¶43.  As with EnviroTechnologies, the Pages' knew that boiler room personnel would promote EnviroTechnologies as a good investment opportunity without disclosing that the persons controlling the company intended to sell their shares to the investors those personnel were soliciting.  *See* Comp., ¶61.  The Pages' unlawful sales of BioHemp stock generated about $3.6 million in proceeds.  *See* Comp., ¶63; Donelan Dec., ¶21.

As with EnviroTechnologies, the Pages were affiliates of BioHemp and their sales of BioHemp's stock through Wellesley, Porrima and Emergent were not registered.  Neither the Pages nor their associates filed registration statements with the Commission.  *See* Comp., ¶64; Donelan Dec., ¶20.a.  Further, they sold well more than 1% of BioHemp's stock within a three-month period and thus did not comply with safe harbor conditions that could have exempted their sales from registration.  *See* Donelan Dec., ¶42.  In addition, because BioHemp's stock was registered under Section 12 of the Exchange Act, any person or entity that was the beneficial owner of more than 5% of BioHemp's stock was required to file statements disclosing their beneficial ownership with the Commission.  *See* 15 U.S.C. §78m(d)(1); 17 C.F.R. §240.13d-1; Donelan Dec., ¶20.d.  The Pages and FJ Investments were each beneficial owners of more than 5% of BioHemp's shares but failed to file the required statements disclosing their ownership. *See* Comp., ¶¶65-67; Donelan Dec., ¶20.c.

### D.    The Pages' Unlawful Cross-Trade Schemes

In addition to the EnviroTechnologies and BioHemp schemes described above, the Pages engaged in illegal cross-trades relating to their sales of Link securities, a company whose stock the Pages also controlled.  *See* Comp., ¶69; Donelan Dec., ¶44.  In February 2018, Timothy Page

spoke with an individual who was cooperating with an FBI investigation.  Timothy Page and the witness discussed how they could arrange for the witness to use a network of brokers to buy Link stock (that the Pages owned through nominee entities) on behalf of unsuspecting brokerage customers in exchange for a 20 to 25% kickback.  *See* Comp., ¶75; Donelan Dec., ¶44.  The Pages then coordinated those cross trades with a cooperating witness on February 15, 16, 27 and March 1, 2018.  *See* Comp., ¶¶76-79; Donelan Dec., ¶¶46-48.

## ARGUMENT

The Court should enter an order freezing and repatriating assets.  To obtain an asset freeze, the Commission must show either (1) a likelihood of success on the merits; or (2) that an inference can be drawn that defendant has violated the federal securities laws.  *See Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011).

**I.    The Commission is Likely to Succeed on its Claims that the Pages and the Page Nominees Violated the Antifraud Provisions of the Securities Act and Exchange Act.**

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. §78j(b).  "Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith."  *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)).  Rule 10b-5 implements Section 10(b) by making it unlawful: "(a) To employ any device, scheme, or artifice to defraud; . . .  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. §240.10b-5.

Similarly, Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities: "(1) To employ any device, scheme, or artifice to defraud; or . . .  (3) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. §77q(a).

To establish the defendants' liability under these antifraud provisions, the Commission must show that, acting with scienter, they engaged in a fraudulent scheme or course of business.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *SEC v. China Northeast Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  The Commission need not plead scienter for a claim under subsection (3) of Section 17(a), for which a showing of negligence is sufficient.  *See Aaron v. SEC*, 446 U.S. 680, 695-96 (1980); *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).  Unlike private litigants, "the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud," although, in this case, the evidence demonstrates that investors were, and would continue to be, significantly harmed.  *SEC v. Lee,* 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010).

The language of these provisions is "expansive" and they "capture a wide range of conduct."  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).  *Lorenzo* defined the term "device," simply as something "devised, or formed by design," defined a scheme as a "project, plan or program of something to be done," and defined an artifice as "an artful stratagem or trick."  *Id.* (internal quotations and citations omitted).  The Court similarly defined "act" and "practice" broadly to include things done, actions and deeds.  *See id.*  As detailed below, the Pages' and the Page Nominees' conduct satisfies each of these elements.  Their conduct was deliberate and complex, and was designed to conceal, obfuscate and mislead the market and its gatekeepers

about the ownership and sales of vast quantities of microcap stock.

### A.    The Pages and the Page Nominees Engaged in a Fraudulent Scheme.

The Pages, using the Page Nominees under their control, took numerous acts in furtherance of a coordinated fraud to sell shares to unsuspecting investors while concealing their control of the companies whose shares they were selling.  Their deceptive actions included circumventing registration requirements and limitations on the amount of shares they could sell as affiliates.  Among other acts: (1) the Pages routinely used the Page Nominees and other nominees entities like Norfolk Heights Ltd. to conceal from brokers, transfer agents, purchasers, and other market participants the fact that shares under common control were being sold by apparently unrelated entities; (2) the Pages hired counsel to write false and misleading opinion letters that would allow their stock to be deposited with brokers as unrestricted stock, so that their sales of the stock would appear to be ordinary trading transactions, when in reality, purchasers were buying restricted stock from affiliates in an unregistered distribution; (3) the Pages engaged in manipulative trading of EnviroTechnologies stock that seemed coordinated and designed to inflate its price and volume in order to induce others to buy and sell that stock and they also engaged in illegal cross trades in Link stock; and (4) the Pages financed promotions by boiler rooms that induced investors to purchase stock that they were selling.  *See* Comp., ¶¶36-37, 40-41, 43, 46, 48, 49, 55, 57-58, 60, 77-80; Donelan Dec., ¶¶25, 27-28, 31-32, 41-49; *SEC v. Fiore*, 416 F. Supp. 3d 306, 320-21 (S.D.N.Y. 2019) (SEC pled sufficient deceptive conduct by entities who acquired and sold penny stocks into misleading promotions for which they paid).

### B.    The Pages and the Page Nominees Acted with Scienter.

Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter.  Scienter is the "mental state embracing intent to

deceive, manipulate or defraud." *Ernst*, 425 U.S. at 193 n.12.  The law does not require direct

evidence of scienter, rather "proof of scienter is often a matter of inference from circumstantial

evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

      The Pages' scienter is demonstrated by their repeated pattern of obscuring their control of

the companies whose stock they sold.  Timothy Page has been involved in prior Commission

cases where judgments were entered against him that ordered him not to violate the registration

and broker dealer requirements of the federal securities laws and he was previously enjoined

from engaging in conduct relating to penny stocks.  *See Offill*, No. 07-cv-01643, Dkt. No. 159

(finding that Page illegally sold securities while hiring others to promote the stock of the

company he sold); *Connectajet*, No. 09-cv-01742, Dkt. Nos. 89-91 (entry of final judgment

against Page in a case in which he was alleged to have illegally sold unregistered shares of

stock).  Those prior matters demonstrate that he was on notice of his legal obligations in the

penny stock area well before he engaged in the conduct at issue in this case.  Further, Trevor

Page was previously licensed as a securities broker in the United States, which required him to

pass a test demonstrating his understanding of the federal securities laws.  *See* Donelan Dec.,

¶10.  The Pages' scienter is imputed to the Page Nominees because they exercised control over

those entities' actions.  *See SEC v. Manor Nursing Ctrs. Inc,* 458 F.2d 1082, 1096, n.16 (2d Cir.

1972) (scienter of an individual who controls a business may be imputed to that entity).  In this

case, the Pages utilized nominee entities to conceal thier ownership of stock, they coordinated

their stock sales with, and paid for, promotional activities that they knew would not disclose their

involvement; and they engaged in manipulative trading that Tim Page conceded he was doing to

facilitate their further stock sales.  *See* Comp., ¶¶40-41, 43, 46-48, 49, 55, 57-58, 60, 77-80;

Donelan Dec., ¶¶25, 27-28, 31-32, 41-49.  All of these attempts by the Pages to obscure their

involvement demonstrate that they understood their conduct was illegal, and Tim Page's recidivism demonstrates that he did not care.  The Pages' intent is further demonstrated by their utilization of illegal foreign trading platforms, whose business models were premised on enabling the clandestine dump of restricted shares on the market by control persons.  *See SEC v. Bajic,* No. 20-cv-007-LGS-KP, Dkt. No. 236 (Report and Recommendation Following Damages Inquest (dated Feb. 1, 2021) at p. 2-4 (describing business model of the defendant trading platform entities).

The Pages thereby defrauded investors who thought they were purchasing legitimately unrestricted shares and were unaware of the massive dumps by those controlling the company. *See SEC v. Esposito*, 260 F. Supp. 3d 79, 91 (D. Mass. 2017) (defendants liable for securities fraud scheme who "fabricated corporate documents and regulatory filings, and submitted them to the transfer agent, along with false attorney opinion letters, as part of the scheme to induce the transfer agent to issue hundreds of millions of purportedly unrestricted [] shares that were ultimately sold to the investing public despite the trading prohibitions on their sale").  As a result of their illegal stock sales, the Pages made millions at the expense of investors who were kept in the dark about their control over the companies' stock they was selling.  *See* Donelan Dec., ¶21.

### C.    The Pages' and the Page Nominees' Fraud Was "In Connection With" the Purchase or Sale of Securities.

The Commission is likely to succeed in demonstrating that the Pages' and Page Nominees' conduct was "in connection with the purchase or sale" of a security for Section 10(b) purposes and "in the offer or sale" of a security for Section 17(a) purposes.  All of their conduct was undertaken to induce investors to purchase securities, which they were selling into the market, and thus meets the antifraud provisions' "in connection with" test.  *See SEC v. Subaye, Inc.*, No. 13-Civ.-3114, 2014 WL 448414, *6 (S.D.N.Y. Feb. 4, 2014) ("[T]he phrase 'in

connection with' is broadly construed . . . . The statement or omission need only be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities.") (citation and internal quotation marks omitted); *SEC v. Zandford*, 535 U.S. 813, 825 (2002) (fraudulent conduct occurs in connection with the purchase or sale of a security if transaction and conduct "coincide").

Given this evidence, the Commission is likely to succeed in proving that the Pages and the Page Nominees engaged in a fraudulent scheme in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and Sections 17(a)(1) and (3) of the Securities Act.

## II.    The Commission Is Likely to Succeed on its Claims That the Pages, Wellesley, Porrima and Emergent Violated the Registration Provisions of the Securities Act.

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) of the Securities Act prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed. *See* 15 U.S.C. §77e(a), (c).  A *prima facie* showing of a Section 5(a) or 5(c) violation requires that: (1) no registration statement was filed or is in effect; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sale was made in connection with the use of interstate communications. *See SEC v. Caledonian Bank, Ltd.,* 145 F. Supp. 3d 290, 305 (S.D.N.Y. 2015) (citing *SEC v. Cavanagh*, 445 F.3d 105, 111 n. 13 (2d Cir. 2006)).

Liability under Section 5 extends to persons who "engaged in steps necessary to the distribution of [unregistered] security issues."  *SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941).  Courts interpreting the "sale" element have concluded that it may be satisfied by a showing that a defendant was a "necessary participant" or a "substantial factor" in the unregistered sale or offer of sale.  *See Zacharias v. SEC,* 569 F.3d 458, 464-66

17

(D.C. Cir. 2009) (applying "substantial factor" test); *see also SEC v. Holschuh,* 694 F.2d 130, 139-40 (7th Cir. 1982) ("[T]he relevant inquiry in an enforcement action is whether the evidence shows that the defendant was a substantial and necessary participant in the sales transactions."). Section 5 violations are strict liability offenses and do not require proof of scienter.  *See SEC v. Czarnik*, No. 10-Civ-745, 2010 WL 4860678, *11 (S.D.N.Y. Nov. 29, 2010).

The requirement for a registration statement applies to each separate offer and sale and does not attach to the security itself; thus, "proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." *Universal Exp.,* 475 F. Supp. 2d at 422.  For at least the EnviroTechnologies sales orchestrated by the Pages and the BioHemp sales that the Pages made through Wellesley, Porrima and Emergent, there were no registration statements filed or effective for the offers and sales to the public of the securities that were controlled by them or their control group clients.  *See* Comp., ¶¶54, 64; Donelan Dec., ¶¶20.a, 21.  These unregistered offers and sales were not private offers or sales because they were made through the interstate telecommunications facilities of the over-the-counter market and because the trades were often made utilizing foreign brokerage accounts which had to communicate those trades through interstate facilities into the United States market.  *See* Comp., ¶¶15, 31, 41, 54, 59, 64, 68, 84; Donelan Dec., ¶¶7.c, 17-19.  Thus, a prima facie case of a Section 5 violation is met.

While Wellesley, Porrima and Emergent were actual sellers, the Pages were both "necessary participants" and "substantial factors" in the sale of the relevant EnviroTechnologies and BioHemp securities.  The Pages were the undisclosed control persons, via nominee entities that took direction from them, responsible for sales to the unwitting buyers who purchased the shares of those companies.  *See* Comp., ¶¶4-41, 57-58; Donelan Dec., ¶¶11-15, 25, 26, 39-40.

18

They perpetuated the charade that sales from accounts they controlled were ordinary open market sales of unrestricted shares.  The Pages were affiliates of both EnviroTechnologies and BioHemp because they controlled those businesses and substantially all of their purportedly unrestricted shares that were available for sale in the U.S. markets.  *See Longfin*, 316 F. Supp. 3d at 759.

Accordingly, the Commission has established a likelihood of proving that the Pages, Wellesley, Porrima and Emergent violated Sections 5(a) and (c) of the Securities Act.

**III.    The Commission Is Likely to Succeed on its Claims that the Pages Violated Section 9(a)(2) of the Exchange Act.**

Section 9(a)(2) of the Exchange Act prohibits any person, directly or indirectly, from effecting: (1) a series of transactions in any security; (2) creating actual or apparent active trading in such security, or raising or depressing the price of such security; (3) for the purpose of inducing the purchase or sale of such security by others.  *See United States v. Stein*, 456 F.2d 844, 850 (2d Cir. 1972) (describing the elements); *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 61-62 (S.D.N.Y. 2017) (same).  The purpose of Section 9(a)(2) is to "outlaw *every* device used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage."  *Lek Sec. Corp.*, 276 F. Supp. 3d at 62 (emphasis added).  Accordingly, a "series" of transactions, as that term is used in the statute, is broadly construed; for example, "[c]ourts have held that a series of transactions includes not only completed purchases or sales but also bids and orders to purchase or sell securities."  *Id.* (internal quotations omitted); *see also SEC v. Chen at al.*, No. 19-cv-12127-WGY, Dkt. No. 11 (D. Mass. Oct. 15, 2019) (granting temporary restraining in a case concerning, among other things, violations of Section 9(a)(2) of the Exchange Act where the defendants created the false appearance of bona fide trading by market participants).

The Pages violated Section 9(a)(2) of the Exchange Act by making numerous small purchases of EnviroTechnologies stock in the open market to maintain its price after the volume of trading decreased in 2018.  *See* Comp., ¶¶46-48; Donelan Dec., ¶28.  Timothy Page described the process to the FBI's cooperating witness and explained that he was doing it to prop up the price; meaning that he engaged in a series of transaction to raise the price of a security and to induce others to buy the stock he intended to sell.  *See* Comp., ¶46; Donelan Dec., ¶27.  As described above, the Pages also engaged in cross trades to manipulate the stock price of Link.  *See* Comp., ¶¶77-80; Donelan Dec., ¶¶44-49.

## IV.   The Commission Is Likely to Succeed on its Claims That the Pages and FJ Investments Violated Section 13(d) of the Exchange Act.

Section 13(d)(1) of the Exchange Act and Rule 13d-1 together require disclosure of the identity of any person or group that has acquired beneficial ownership of more than five percent of an equity security registered pursuant to Section 12(g) of the Exchange Act. 15 U.S.C. §78m(d)(1); 17 C.F.R. §240.13d-101.  Entities or individuals must comply with Section 13(d) by filing a Schedule 13D with the Commission no later than ten business days after they acquire more than five percent of the class of equity security.  *Id*.  Scienter is not required to establish a violation of Section 13(d).  *See, e.g., In the Matter of Lexington Res., Inc., et al.*, SEC Release No. 379, 2009 WL 1684743, at *17-18 (June 5, 2009) (Initial Decision).

The Pages and FJ Investments violated Section 13(d) with respect to their beneficial ownership of BioHemp stock.  BioHemp's shares were registered under Exchange Act Section 12(g).  *See* Comp., ¶¶65, 103; Donelan Decl., ¶20.d.  As of March 2019, the Pages and FJ Investments had acquired more than five percent of BioHemp's outstanding shares.  *See* Comp., ¶¶65-67; Donelan Dec., ¶39.  Neither the Pages nor FJ Investments filed a Schedule 13D with respect to their ownership of BioHemp stock.  *See* Donelan Dec., ¶20.b.  Accordingly, the

20

Commission has established a likelihood of proving that the Pages and FJ Investments violated Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

**V.      The Court Should Freeze Assets Belonging to the Defendants and the Relief Defendant to Prevent Their Dissipation.**

To obtain an asset freeze, the Commission must show either: (1) a likelihood of success on the merits; or (2) that an inference can be drawn that defendant has violated the federal securities laws. *See Smith*, 653 F.3d at 128. This is a lesser required showing than what is required for preliminary injunction. *Id.; SEC v. Jafar*, 13-CV-4645, 2015 WL 3604228, *7 (S.D.N.Y. June 8, 2015) (noting that when an asset freeze is requested, the standard is lower than that of a preliminary injunction and the SEC must show *either* a likelihood of success, *or* that an inference can be drawn); *SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.*, 296 F.R.D. 241, 255 (2d Cir. 2013) ("Asset freeze orders are less burdensome on defendants than other types of injunctive relief; for that reason, the required showing of success on the merits (or a permissible inference) is lower.").

As discussed above, the Commission has shown it is likely to succeed on the merits in this matter and has presented evidence from which an inference can be drawn that the Defendants violated multiple federal securities laws, and did so repeatedly.

An asset freeze is also appropriate in cases, such as this one, where there is a likelihood of remaining assets being dissipated. *See SEC v. Dubovoy*, No. 15-cv-6076, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015). The purpose of an asset freeze is "to preserve funds that a defendant may be ordered to pay if he is held liable," *Onyx Pharmaceuticals*, 296 F.R.D. at 254, and "to ensure that any funds that may become due can be collected." *Smith*, 653 F.3d at 127 (internal quotation marks and citation omitted).

To date, the Commission has been able to identify approximately $12 million in trading

proceeds received by Tim or Trevor Page or entities they control, or by Janan Page, as the result of the trading described in the Complaint.  *See* Donelan Dec. ¶21.

 Based on the trading proceeds that flowed to the Defendants, the Commission believes it may seek monetary judgments in excess of $24 million because it may seek a civil penalty equal to the Defendants' trading proceeds.  Given the anticipated size of the judgment the Commission will likely seek, all accounts and other assets of the Defendants and Janan Page, in whatever form they may exist, should be frozen, so "that any of the funds that may become due," such as disgorgement, civil penalty, and prejudgment interest, "can be collected."  *See* 15 U.S.C. §78u(d)(5); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (holding that a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105-06 (2d Cir. 1972); *SEC v. Credit Bancorp Ltd.*, No. 99-Civ-11395, 2010 WL 768944, *3 (S.D.N.Y. Mar. 8, 2010) ("The asset freeze in this case is necessary to avoid further depletion of funds pending a final judgment."); s*ee also Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974); *First Jersey Sec.,* 101 F.3d at 1476.

## VI.    The Court Should Enter an Order to Repatriate Assets From Foreign Jurisdictions.

Courts may impose an order repatriating funds transferred to foreign jurisdictions.  While the illegal sales described in the complaint primarily occurred in the United States markets, the proceeds of those sales were transferred out of the United States to brokerage accounts in a number of foreign countries.  Tim Page is a citizen of a foreign country and Tim, Trevor and Janan Page all reside outside of the United States.  The Commission is aware that the Defendants hold or have held accounts at financial institutions in the United Kingdom, Switzerland, the Cayman Islands, Fiji, Hungary, Macau, Malta and Mauritius, in addition to the United States. *See* Donelan Dec., ¶51.  A list of the bank and brokerage accounts of which the Commission is

22

aware is contained in paragraph I.A of the Proposed Order filed herewith.  If the Defendants and the Relief Defendant transfer their assets out of these financial institutions, it will be very difficult for the Commission to track those assets in a timely manner.  The Commission believes that amounts traceable to the fraud already have been transferred overseas into both known and unknown accounts.  A repatriation order will further protect any remaining funds from dissipation and put the funds in a frozen account under this Court's control until it is able to adjudicate this case, and if appropriate, enter an order returning those funds to harmed investors.

## **CONCLUSION**

For the reasons set forth above, the Commission respectfully requests that the Court enter an order freezing and repatriating the assets of the Defendants and the Relief Defendant in the form attached hereto.

Respectfully submitted,

/s/ Alicia Reed
Alicia Reed (NY Bar No. 4913596)
Kathleen Burdette Shields (Mass Bar No. 637438)
Eric A. Forni (Mass Bar No. 669685)
Amy Gwiazda (Mass Bar No.663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct);
(617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
shieldska@sec.gov; fornie@sec.gov

DATED: September 23, 2021

## Certificate of Service

I hereby certify that, on September 23, 2021, a true and correct copy of the foregoing document, as well as the accompanying proposed order, memorandum of law and the Declaration of Trevor Donelan and its exhibits, was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.  In addition, the Commission has served a copy of the foregoing document on the following individuals and entities, who are not represented or registered to receive electronic notices in this case, at the following addresses and by the following means:

**Defendants:**
Timothy Page
　　　By email address used in connection with Mr. Page's brokerage and bank accounts

Trevor Page
　　　By email address used in connection with Mr. Page's brokerage and bank accounts

Ticino Capital Limited, Wellesley Holdings Limited, Porrima Limited, Emergent Investments Company
　　　By email address used in connection with their brokerage and bank accounts

FJ Investments International Inc.
　　　By overnight delivery to its business address

**Relief Defendant:**
Janan Page
　　　By email address used in connection with Ms. Page's brokerage and bank accounts


　/s/ Alicia Reed
　　　Alicia Reed