UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

SECURITIES AND EXCHANGE
COMMISSION,                          :

                     Plaintiff,     :

      -against-            :

                                :

TIMOTHY PAGE, TREVOR PAGE, TICINO   :
CAPITAL LIMITED, WELLESLEY
HOLDINGS LIMITED, PORRIMA LIMITED, :
EMERGENT INVESTMENT COMPANY, and :
FJ INVESTMENTS INTERNATIONAL INC.,   :

                 Defendants,     :

JANAN PAGE,                       :

         Relief Defendant.    :

-------------------------------------------------------------- x

**REPORT AND
RECOMMENDATION**

21-CV-5292 (ARR) (PK)

**Peggy Kuo, United States Magistrate Judge:**

The Securities and Exchange Commission ("SEC," "Commission," or "Plaintiff") brought this action against Timothy Page, Trevor Page (together, "the Pages"), Wellesley Holdings Limited ("Wellesley"), Porrima Limited ("Porrima"), Emergent Investment Company ("Emergent") (Wellesley, Porrima and Emergent, collectively, "Corporate Defendants"), Ticino Capital Limited ("Ticino")[1], FJ Investments International Inc. ("FJ Investments")[2] (collectively with the Pages and Corporate Defendants, "Defendants"), and Relief Defendant Janan Page for violations of Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act of 1933 ("Securities Act"); Sections 9(a)(2), 10(b), and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a), (c), and 13d-1 promulgated thereunder.  (*See* "Compl.," Dkt. 1.)  The SEC moved for default judgment against Timothy Page, Wellesley, Porrima, Emergent, and Janan Page (collectively, "Defaulting Defendants").  (Dkts. 60, 65, 75 (the "Motions"); Declaration of Alexandra B. Lavin "Lavin Decl.," Dkt. 58.)

---

[1] On June 29, 2023, the Court granted the SEC's voluntarily dismissal of Ticino.  (Dkt. 67.)

[2] On April 29, 2022, the Court entered a final judgment against FJ Investments.  (Dkt. 34.)

The Honorable Allyne R. Ross referred the Motions to me for a report and recommendation. For the reasons stated herein, I respectfully recommend that the Motion be granted as set forth below.

## BACKGROUND

The following allegations in the Complaint are accepted as true for purposes of the Motion. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of [defendant's] default, a court is required to accept all of [Plaintiff's] factual allegations as true and draw all reasonable inferences in its favor") (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *see also DMKA LLC v. Chanlder W T LLC*, No. 23-CV-3296 (BMC), 2024 WL 406549, at *1 (E.D.N.Y. Feb. 2, 2024) ("Presuming the factual allegations of the complaint and the affidavit in support of the motion for a default judgment to be true as to liability").

## I.    Factual Background

From 2016 to July 2019, Timothy Page and his son Trevor Page schemed fraudulently to sell the stock of various publicly traded companies to investors in the public United States securities markets. (Compl. ¶¶ 1, 8.) The Pages used Corporate Defendants to further their scheme, illegally using a bank account and a brokerage account in Wellesley's name to sell shares of BioHemp and to secretly provide BioHemp with financing; illegally using a brokerage account in Porrima's name to sell shares in BioHemp; and illegally using a brokerage account in Emergent's name to sell shares in BioHemp. (*Id.* ¶¶ 10-12.) The Corporate Defendants are all Hungarian corporations. (*Id.*) Timothy Page is a citizen of the United Kingdom; he and his wife Janan Page have resided in the United Kingdom, Switzerland, and Fiji. (*Id.* ¶¶ 7, 14.)

### A.  EnviroTechnologies

From 2016 through 2018, the Pages engineered a pump-and-dump scheme by concealing their control over EnviroTechnologies. (Compl. ¶ 28.)

Starting in July 2016, the Pages worked with "Person A," an EnviroTechnologies paid consultant. (Compl. ¶¶ 30-31.) Person A paid semi-annual fees to Over-the-Counter Markets, Inc. ("OTC") from a credit card issued to Timothy Page's wife, Janan Page, allowing EnviroTechnologies to be listed for trading by OTC. (Compl. ¶ 31.) Between March 2017 and May 2019, Timothy Page made multiple payments from accounts he controlled to accounts controlled by an officer of EnviroTechnologies who in turn transferred the funds to EnviroTechnologies. (*Id.* at ¶ 32.)

Working with Person A, the Pages consolidated almost all of EnviroTechnologies' purportedly unrestricted stock by acquiring it through foreign entities under the Pages' control. (Compl. ¶¶ 34-35.) The Pages purchased opinion letters authored by EnviroTechnologies' securities counsel ("Person B") that were used to represent to EnviroTechnologies transfer agent that the Pages' entities were not affiliates of EnviroTechnologies, when in fact they were nominees that were used to conceal the Pages' identities. (*Id.* ¶ 39.)

By transferring EnviroTechnologies shares among various companies they controlled or directed, the Pages funneled their shares to a foreign entity that purported to be an asset manager. (Compl. ¶¶ 40-41.) Between February 2017 and May 2018, the Pages arranged for the foreign entity to dump their EnviroTechnologies stock. (*Id.*) From February 2017 to June 2017, the Pages sold approximately 3.9 million shares of EnviroTechnologies stock for approximately $3.7 million, increasing the price of the stock. (*Id.* ¶¶ 42-43.) When trading on the stock slowed down in February 2018, the Pages manipulated the market by creating the false appearance of active trading in EnviroTechnologies' shares. (*Id.* ¶¶ 44-45.) In particular, in a conversation recorded by an FBI cooperator on February 13, 2018, Timothy Page stated that he had arranged for brokerage accounts held in Janan Page's name to place multiple small buy orders of EnviroTechnologies stock to increase the price per share for the purpose of inducing others to invest. (Compl. ¶¶ 45-46.)

In April and May 2018, Timothy Page hired a boiler room[3] to generate more demand for EnviroTechnologies stock. (Compl. ¶ 48.) The Pages knew, or were reckless in not knowing, that the boiler room operator would tout EnviroTechnologies' shares as a good investment opportunity without disclosing that the Pages had hired the boiler room or that the persons who controlled the company intended to sell their shares to the investors solicited by the boiler room. (Compl. ¶ 49.) Further, the Pages knew or were reckless in not knowing that their shares were legally required to be registered and, therefore, could not be resold without such registration. (Compl. ¶ 51.)

### B. BioHemp

In early 2018, the Pages took control of BioHemp by asking "Person C" to incorporate a company, FJ Investments, which then purchased the majority of BioHemp's outstanding shares without providing any consideration for those shares. (Compl. ¶ 54.) Subsequently, the Pages arranged via FJ Investments to install "Person D," an associate of the Pages who acted at their direction, as the CEO of BioHemp. (Compl. ¶ 55.)

Between May and July 2019, the Pages, through the Corporate Defendants, purchased 99.7% of BioHemp's floating stock. (Compl. ¶¶ 56-57.) After obtaining these purportedly unrestricted shares in the names of the Corporate Defendants, the Pages deposited the stock with offshore brokerage firms that subsequently sold over 3 million shares of BioHemp stock. (Compl. ¶ 58.) Timothy Page hired the same boiler room operator as he did in the EnviroTechnologies scheme to entice investors to purchase BioHemp shares. The Pages knew or were reckless in not knowing that the boiler room operator would tout BioHemp's shares without disclosing that the persons controlling BioHemp intended to sell their shares to investors solicited by the boiler room operator. (*Id.* ¶¶ 59-60.) Further, the Pages and the Corporate Defendants knew or were reckless in not knowing that

---

[3] "A 'boiler room' is a telemarketing or email marketing operation that uses high-pressure selling techniques to sell stocks of questionable value to the buyer without disclosing material facts about the issuer." *SEC v. Carillo Huettel LLP*, No. 13-CV-1735 (GBD)(JCF), 2017 WL 213067, *1 n.3 (S.D.N.Y. Jan. 17, 2017) (citation omitted).

their shares were legally restricted from sale, based on their concealment of their control over BioHemp. (*Id.* ¶ 61.) The Pages received $3.6 million from selling BioHemp stock. (*Id.* ¶ 62.)

Because the Pages had exclusive control over the shares acquired by FJ Investments, they had investment power within the meaning of Rule 13d-3(a), and therefore had acquired beneficial ownership of those shares within the meaning of Rule 13d-5(a). Accordingly, the Pages were required to file a statement of beneficial ownership but failed to do so. (Compl. ¶¶ 65-66.)

### C. Link

From February 2016 through February 2018, the Pages controlled Link through similar means as they did EnviroTechnologies. (Compl. ¶ 67.) The Pages also controlled Link's stock, as evidenced by Timothy Page's statements to an FBI Cooperator on February 13, 2018 explaining that the Pages had acquired nearly all of Link's unrestricted shares. (Compl. ¶ 68.) The Pages knew, or were reckless in not knowing, that they were affiliates of Link and that their stock was legally restricted from resale. (Compl. ¶ 69.)

In February 2016, the Pages deposited 15,000,000 Link shares into a foreign account in the name of Norfolk Heights Ltd. and again hired the same boiler room operator to promote Link shares. (Compl. ¶ 70.) From October 2016 to April 2017, the Pages, through Norfolk Heights Ltd., sold 2.3 million shares of Link, earning at least $1.9 million. (*Id.*). At least $762,500 of these proceeds went to personal bank accounts in the names of Timothy and Janan Page, and over $772,000 went to the boiler room operator. (*Id.* ¶¶ 71-72.)

As recorded during the February 13, 2018 call, Timothy Page offered the FBI Cooperator a 20 to 25% kickback in exchange for using a network of brokers to buy Link stock on behalf of unsuspecting brokerage customers. (Compl. ¶ 74.) The Pages coordinated cross trade with the FBI Cooperator on February 15, 16, and 27, 2018 and March 1, 2018. (*Id.* ¶¶ 76, 78.) During a call with the FBI Cooperator on February 23, 2018, the Pages discussed their intent to pay the kickbacks from

the Pages' personal account, and that they had been placing trades to maintain the price of Link until the FBI Cooperator could arrange more purchases. (*Id.* ¶¶ 77, 79.)

### D. Cyberfort

The Pages obtained control of Cyberfort through Person D in exchange for various payments to that person from 2017 to 2020. (Compl. ¶ 81.) In early 2018, the Pages retained the same boiler room operator to push Cyberfort's shares onto investors without disclosing that the Pages had hired the boiler room operator or that the persons in control of Cyberfort intended to sell their shares. (*Id.* ¶ 82.) In June 2018, the Pages used their nominee, Ticino, to deposit 1,250,000 shares of Cyberfort into a foreign account. (*Id.* ¶ 83.) Between June 19, 2018 and September 10, 2018, the Pages, through Tincio, sold these shares. In October 2018, the Pages, through Emergent, deposited another 1,250,000 shares of Cyberfort into a foreign account, selling approximately 20,000 into the United States securities markets. In total, the Pages sold at least 1.27 million shares of Cyberfort for approximately $1.9 million. (*Id.* ¶ 84.)

### E. Monetary Transfers to Janan Page

The proceeds from the Pages' schemes were transferred to Janan Page. For example, In October and November 2016, Timothy Page caused a foreign account to transfer approximately $410,000 to a bank account that was at least partially controlled by Janan Page. (Compl. ¶ 87.) Janan Page did not provide consideration for these proceeds. (*Id.*)

## II.    <u>Relevant Procedural Background</u>

The SEC filed the Complaint on September 23, 2021, alleging that "Defendants schemed fraudulently to sell the stock of various publicly traded companies . . . to investors in the public United States securities markets," and that "Timothy Page and Trevor Page also engaged boiler rooms . . . to generate artificial demand for their stock by making false and misleading statements to investors." (Compl. ¶ 1.)

The SEC served the Summons and Complaint on Emergent in Hungary on December 15, 2021, pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (the "Hague Convention" or the "Convention").  (Dkt. 46; Lavin Decl. ¶ 23.)  The SEC served the Summons and Complaint on Wellesley and Porrima in Hungary on December 17, 2021, pursuant to the Convention.  (Dkts. 35, 36; Lavin Decl. ¶ 24.)  The SEC served the Summons and Complaint on Timothy Page and Janan Page in the United Kingdom on May 30, 2022, pursuant to the Convention.  (Dkts. 42, 44; Lavin Decl. ¶ 26.)  The Defaulting Defendants failed to answer or otherwise respond to the Complaint.  (Lavin Decl. ¶¶ 25, 27.)  Upon request by the SEC, the Clerk of Court issued Certificates of Default against the Defaulting Defendants on April 3, 2023. (Dkts. 52, 54, 55.)

On May 3, 2023, the SEC filed motions for default judgment against the Defaulting Defendants.[4]  (Dkts. 60, 62-65.)  The SEC withdrew the motions against Wellesley, Porrima, and Emergent because it did not mail the motion papers to those defendants.  (Dkts. 62-64.)  It then filed a renewed motion for default judgment as to those Defendants.  (Dkt. 75.)

## DISCUSSION

### I.    Default Judgment Standard

Rule 55 of the Federal Rules of Civil Procedure prescribes a two-step process for entry of a default judgment.  First, when a defendant "has failed to plead or otherwise defend," the Clerk of Court enters the defendant's default.  Fed. R. Civ. P. 55(a).  The plaintiff may then move the court for an entry of default judgment.  Fed. R. Civ. P. 55(b)(2).

"[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter

---

[4] The SEC also moved for default judgment against Trevor Page (Dkt. 61), but Trevor Page later appeared. (Dkts. 69, 71.)  On January 23, 2024, the Court granted the SEC's motion to withdraw its Motion for Default Judgment with respect to Trevor Page.  (Order dated Jan. 23, 2024.)  Trevor Page is actively defending the case against him.  (*See, e.g.,* Motion for Extension of Time to File Answer, Dkt. 87.)

of right." *GuideOne Specialty Mut. Ins. Co. v. Rock Cmty. Church, Inc.*, 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010). The plaintiff must demonstrate proper service of the summons and complaint. *See Advanced Capital Commercial Group, Inc. v. Suarez*, No. 09-CV-5558 (DRH)(GRB), 2013 WL 5329254, at *2 (E.D.N.Y. Sept. 20, 2013). The court must assure itself that it has subject matter jurisdiction and may also examine whether it has personal jurisdiction over the defendant. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011). The plaintiff must also establish compliance with the procedural requirements of Local Civ. Rules 7.1 and 55.2.

The Court must also determine whether the plaintiff's "allegations establish [the defendant's] liability as a matter of law." *Finkel*, 577 F.3d at 84. "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). In considering a motion for default judgment, a court accepts a plaintiff's "factual allegations as true and draw[s] all reasonable inferences in [the plaintiff's] favor." *Finkel*, 577 F.3d at 84. However, a default is "not considered an admission of damages." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158. "The plaintiff bears the burden of presenting proof of damages, which may take the form of documentary evidence or detailed affidavits." *Joe Hand Promotions, Inc. v. Benitez*, No. 18-CV-06476 (ARR)(PK), 2020 WL 5519200, at *3 (E.D.N.Y. Aug. 27, 2020), *R&R adopted*, 2020 WL 5517240 (E.D.N.Y. Sept. 14, 2020).

District courts may also, in their discretion, hold a hearing to assess the amount of damages that should be awarded on a default. *See* Fed. R. Civ. P. 55(b)(2); *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). However, "it is not necessary for a District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997) (cleaned up). The court may do so by relying on affidavits and other documentary evidence. *See, e.g.*, *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) ("not necessary for the

district court to hold a hearing to fix damages after a default judgment had been entered where the court had 'relied upon detailed affidavits and documentary evidence supplemented by the District Judge's personal knowledge of the record").

A court "possesses significant discretion" in granting a motion for default judgment, "including [determining] whether the grounds for default are clearly established." *Klideris v. Trattoria El Greco*, No. 10-CV-4288 (JBW)(CLP), 2011 WL 7114003, at *2 (E.D.N.Y. Sept. 23, 2011), *R&R adopted*, 2012 WL 273078 (E.D.N.Y. Jan. 30, 2012).

## II.    Jurisdiction

### A.    Subject Matter Jurisdiction

The Court has subject matter jurisdiction over the SEC's claims pursuant to Section 22(a) of the Securities Act and Sections 21(d), 21(e), and 27 of the Exchange Act.

### B.    Service on Defendants

Federal Rules of Civil Procedure 4(f) and 4(h)(2) govern service of process of individuals in foreign countries and corporations located outside any judicial district of the United States, respectively. As relevant here, an individual in a foreign country may be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1). A corporation located "at a place not within any judicial district of the United States" may be served "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."

The United States, United Kingdom, and Hungary are all signatories to the Hague Convention. *See, e.g.*, *Water Splash, Inc. v. Menon*, 581 U.S. 271, 283 n.7 (2017) (noting that Hungary is a signatory country to the Hague Convention); *Voice Tele Servs. V. Zee Telecoms Ltd.*, 338 F.R.D. 200 (S.D.N.Y. 2021) ("the United States and the United Kingdom are both signatories to the Hague Convention").

9

Pursuant to the Hague Convention, each signatory state must designate a central authority to receive requests for service coming from other contracting states. Hague Convention Art. 2. In turn, the central authority will consider incoming requests and, assuming those requests comply with the Convention's requirements, serve the documents itself or arrange to have them served by an appropriate agency. Hague Convention Art. 3-5.

Here, the SEC requested that the central authority of Hungary serve Wellesley, Porrima, and Emergent with the Summons and Complaint, and that the central authority of the United Kingdom serve Timothy Page and Janan Page with the Summons and Complaint. (Dkts. 35, 36, 42, 44, 46; Lavin Decl. ¶¶ 23-24, 26.) In turn, those central authorities served the Defaulting Defendants in accordance with Article 5 of the Hague Convention. (Dkts. 35, 36, 42, 44, 46.) Accordingly, the SEC effectuated proper service of the Summons and Complaint on all Defaulting Defendants.

### C. Personal Jurisdiction

"[S]erving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (quoting Fed. R. Civ. P. 4(k)(1)(A)).

Under the Securities Act, "[a]ny such suit or action may be brought . . . in the district where the offer or sale took place, if the defendant participated therein." Securities Act § 22(a). Pursuant to the Exchange Act, "[a]ny suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant . . . transacts business." Exchange Act § 27(a). Here, Defendants' "acts, practices, transactions and courses of business . . . occurred within the Eastern District of New York and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the

10

mails." (Compl. ¶ 6.) For example, "individuals who reside in the Eastern District of New York purchased the stock of EnviroTechnologies and Cyberfort." (*Id.*) Accordingly, the Court has personal jurisdiction over the Defaulting Defendants.

### III.    Procedural Compliance with Local Civil Rules 7.1 and 55.2

As part of the Motions and in compliance with the Local Civil Rules, the SEC included memoranda of law (Lavin Decl.; "SEC Mem.," Dkt. 76); copies of the Clerks' Certificates of Default (Dkts. 58-9, 58-10, 58-11, 77-5); a copy of the Complaint (Dkts. 58-1, 77-1); proof of service of the Complaint (Dkts. 58-2, 58-3, 58-4, 58-5, 58-6, 58-7, 77-2, 77-3, 77-4); proposed judgments (Dkts. 60, 65, 75-1, 75-2, 75-3); and proof of mailing the Motion and associated papers to Wellesley, Porrima, and Emergent at their last known business addresses and to Timothy Page and Janan Page at their last known residences (Lavin Decl. at 30 (ECF pagination); Dkt. 78.) *See* Local Civil Rules 7.1 and 55.2. In addition, the SEC attached a declaration stating that Timothy Page and Janan Page are not infants, in the military, or incompetent persons. (Lavin Decl. ¶ 3.) *See* Local Civil Rule 55.1(b)(1). Thus, compliance with the Local Civil Rules is satisfied.

### IV.    Liability

#### A. *Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act*

The SEC alleges both primary liability and scheme liability for violations of Section 10(b) of the Exchange Act, Rule 10b–5 promulgated thereunder, and Section 17(a)(1) and (3) of the Securities Act. (SEC Mem. at 4; Lavin Decl. at ¶ 30.) Despite referencing both primary liability and scheme liability, the SEC's allegations adhere more closely to scheme liability, which on its own is sufficient to find Defendants liable. (*See* SEC Mem. at 4-9.) Accordingly, I apply scheme liability here.

Courts have read Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) to create "scheme liability" for those who, "with scienter, engage in deceitful conduct." *SEC v. Sason*, 433 F. Supp. 3d 496, 508 (S.D.N.Y. 2020) (citing *SEC v. Jean-Pierre*, No. 12-CV-8886 (LGS),

2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)).  Scheme liability requires the SEC to demonstrate that "defendants participated in an illegitimate, sham or inherently deceptive transaction where their conduct or role had the purpose and effect of creating a false appearance."  *Id.* (cleaned up).  To state a scheme liability claim, the SEC must allege that "defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter."  *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (internal quotation marks and citation omitted).  The SEC must also show that the act creating liability was performed using any means or instrumentality of interstate commerce.  15 U.S.C. §§ 77q, 78j(b).

"The elements of a claim under § 17(a) . . . are essentially the same as the elements of claims under § 10(b) and Rule 10b-5," *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016), except that "no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *SEC v. Carrillo Huettel LLP*, No. 13-CV-1735 (GBD)(JCF), 2017 WL 213067, at *3 (S.D.N.Y. Jan. 17, 2017) (internal quotation marks omitted) (alterations in original) (citing *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).  "Because Section 10(b), Rule 10b-5, and Section 17(a) all sound in fraud, the plaintiff must state the circumstances constituting fraud or mistake with particularity." *SEC v. Fiore*, 416 F. Supp. 3d 306, 319-20 (S.D.N.Y. 2019) (cleaned up).

Here, the Complaint alleges that Timothy Page and the Corporate Defendants committed deceptive or manipulative acts in furtherance of an alleged pump and dump scheme to defraud investors.  A "manipulative or deceptive act" is "some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  As described *supra*, Timothy and Trevor Page used nominees, including the Corporate Defendants, to conceal their control of and substantial interests in EnviroTechnologies, BioHemp, Link, and Cyberfort.  (*See, e.g.*, Compl. ¶¶ 1, 34, 56-57, 84.) With respect to EnviroTechnologies and BioHemp, Trevor Page coordinated with another person to author false and misleading opinion letters to enable stock certificates in these stocks to be issued

12

without a restricted legend that would prevent the shares from being deposited with a broker dealer and sold to investors in the public market. (*Id.* ¶¶ 36-39, 54.) At the Pages' direction, the nominees transferred the unrestricted stock to foreign entities for the purpose of selling them, the transfers taking place via entities that included the Corporate Defendants. (*Id.* ¶¶ 41, 58, 70, 83-84.) Timothy Page used tactics, such as making manipulative purchases and sales of stock and hiring boiler room operators to pressure investors into purchasing stocks—without disclosing that he had hired them and had ownership interests in those stocks—to inflate the price of the stocks so he could sell them at a profit. (*See, e.g., Id.* ¶¶ 45, 48-49, 59-60, 70-72, 74-79.)

Accordingly, the Complaint's allegations are sufficient to establish that Timothy Page and the Corporate Defendants all committed a deceptive or manipulative act in furtherance of an alleged scheme to defraud investors. *See SEC v. Airborne Wireless Network*, No. 21-CV-1772 (CM), 2023 WL 5938527, at *24 (Sept. 12, 2023) (defendant's "concealment of his purchase and control of Airborne and its stock demonstrate scheme liability"); *SEC v. Stubos*, 634 F. Supp. 3d 174, 201 (S.D.N.Y. 2022) (finding that using nominees to conceal a company's true control supported scheme liability); *SEC v. Perm*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) ("By disguising the ultimate recipient of the funds . . . [defendant] engaged in an inherently deceptive act"); *see also SEC v. Verges*, 2024 WL 531260, at *7 (N.D. Tex. Feb. 9, 2024) (complaint "pleaded sufficient facts to satisfy the deceptive and manipulative act element of scheme liability" where defendants dumped artificially inflated stock in pump and dump scheme); *SEC v. DeFrancesco*, No. 23-CV-131 (JSR), 2023 WL 6965051, at *7 (S.D.N.Y. Oct. 23, 2023) (defendants' assisting with fraudulent promotional articles and approving a debt-for-equity exchange were manipulative or deceptive acts in furtherance of pump and dump scheme).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), that can "be established through a showing of reckless

disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. StratoComm Corp.*, 652 F.App'x 35, 38 (2d Cir. 2016) (citation omitted). Alternatively, scienter may be "satisfied by a showing [that] a defendant 'benefitted in a concrete and personal way from the purported fraud.'" *Airborne Wireless*, 2023 WL 5938527, at *26 (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)); *see also, e.g.*, *In re Pall Corp.*, No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). Here, the Complaint alleges that Timothy Page's schemes yielded him millions of dollars in proceeds. (Compl. ¶¶ 52, 62, 70-71, 84.) By obtaining such sums of money, Timothy Page benefitted from the fraudulent scheme and, therefore, the Complaint sufficiently alleges scienter.

As to the Corporate Defendants' scienter, an individual's "knowledge is imputed to the corporations which he controlled." *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972); *see, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, … the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.") (*See* "Supp. Mem.," Dkt. 82 at 2-4.) The Complaint alleges that Timothy and Trevor Page used the Corporate Defendants as they saw fit to acquire stock, conceal their ownership of that stock, and deposit that stock with offshore brokerage firms to sell (*see* Compl. ¶¶ 56-58, 84); it also describes the Corporate Defendants as Timothy and Trevor Page's "nominees," (*see, e.g.*, Compl. ¶ 57), a term that Plaintiff defines as "front" companies serving under the Pages' control. (Compl. ¶ 55(iv).) Thus, because the Complaint alleges that Timothy Page controlled the Corporate Defendants and used them in his schemes to defraud, his scienter is imputed to the Corporate Defendants.

Finally, Timothy Page and the Corporate Defendants effectuated their scheme to defraud by use of the instrumentalities of interstate commerce. For example, the Complaint alleges that Timothy

14

Page hired boiler room operators to call potential investors and pressure them into purchasing shares of the various companies that the Pages controlled. (Compl. ¶¶ 48, 59, 70, 80.) By utilizing telephones as a part of his scheme, Timothy Page used an instrumentality of interstate commerce. *See, e.g., SEC v. Baldassare*, No. 11-CV-5970 (ARR)(VVP), 2014 WL 2465622, at *6 (E.D.N.Y. May 29, 2014) ("by using the telephone to orchestrate their fraudulent scheme, the defendants used an 'instrument' or 'instrumentality' of interstate commerce"). In addition, the Complaint alleges that Timothy Page, through the Corporate Defendants and other nominees, transferred his shares to offshore entities to sell. (Compl. ¶¶ 41, 58, 70, 83-84.) Effectuating such transfers and sales necessarily involves the use of instrumentalities of interstate commerce such as email, telephone, or the internet. *See CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 441 n. 24 ("It is undisputed that the use of the internet is an instrumentality of interstate commerce. . . . The same is true for wire transfers . . . and email") (cleaned up).

Accordingly, I respectfully recommend that the Court find that Timothy Page and the Corporate Defendants violated the antifraud provisions of the securities laws.

### B. Section 9(a)(2) of the Exchange Act

Section 9(a)(2) of the Exchange Act makes it unlawful for any person to "effect . . . a series of transaction in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. §78i(a)(1). To sufficiently allege a Section 9(a)(2) claim, the plaintiff must show "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others." *SEC v. Hwang*, No. 22-CV-3402 (JPO), 2023 WL 6124041, at *11 (S.D.N.Y. Sept. 19, 2023) (internal quotation marks and citation omitted).

The third element of a Section 9(a)(2) claim is "often referred to as the requirement of a 'manipulative purpose.'" *SEC v. Schiffer*, No. 97-CV-5853 (RO), 1998 WL 226101, at *4 n.10 (S.D.N.Y. May 5, 1998). This can be satisfied by allegations of market manipulation, which "'refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *SEC v. Gallagher*, No. 21-CV-8739 (PKC), 2023 WL 6276688, at *14 (S.D.N.Y. Sept. 23, 2023) (citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977). However, even "'[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent.'" *Id.* (alterations in original) (citing *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 77 (2d Cir. 2021)). The "gravamen" of market manipulation "is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) (citing *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12 (1985)).

Here, the Complaint alleges that Timothy Page made "many" small buy orders of EnviroTechnologies stock to maintain an artificially high stock price so that he could sell his remaining stock at that artificial price. (Compl. ¶¶ 45-46.) Plaintiff supports Timothy Page's manipulative intent by including excerpts from his February 13, 2018 conversation with an FBI Cooperator during which he made statements such as, "we are maintaining the price, and it's costing us money." (*Id.* ¶ 45.) The Complaint also sets forth a chart of Timothy Page's purchases of EnviroTechnologies stock from February 1, 2018 to February 28, 2018 in Janan Page's Accounts, which depicts Timothy Page's attempts to manipulate the market to artificially inflate the price of EnviroTechnologies shares. (Compl. ¶ 47.) These allegations are sufficient to establish that Timothy Page violated Section 9(a)(2). *See SEC v. Stubos*, 634 F. Supp. 3d 174, 202-03 (S.D.N.Y. Oct. 11, 2022) (finding complaint adequately

pleaded Section 9(a)(2) claim where it alleged that defendant bought stock to support and inflate its price, actually influenced its price, and made statements with respect to influencing the market).

Likewise, the Complaint alleges that Timothy Page coordinated cross-trades with an FBI Cooperator on February 15, 16, and 23, 2018 in order to maintain the price of Link stock after the effect of the boiler room promotion he funded began to wane. (Compl. ¶¶ 74-76, 78.) In addition, Timothy Page admitted during the same February 13, 2018 conversation with the FBI Cooperator that he had been placing trades to support the price of Link at $0.11 per share until the FBI Cooperator could arrange for more cross-trades. (*Id.* ¶ 79.) These allegations, too, sufficiently set forth a violation of Section 9(a)(2). *See Stubos*, 634 F. Supp. 3d at 202-03; *SEC v. Militano*, No. 89-CV-572 (JFK), 1994 WL 285472, at *1 (S.D.N.Y. 1994) (noting a Section 9(a)(2) violation where defendant "admitted to executing cross trades").

Accordingly, I respectfully recommend that the Court find Timothy Page liable for violating Section 9(a)(2) of the Exchange Act.

### C.  *Registration Provisions of Sections 5(a) and 5(c) of the Securities Act*

Section 5 of the Securities Act requires that securities be registered with the SEC before any person may sell or offer to sell such securities." *SEC v. Cavanagh,* 445 F.3d 105, 111 (2d Cir. 2006) (citing Securities Act § 5). "To state a cause of action under Section 5, one must show (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *Id.* at 111 n.13 (internal quotation marks and citation omitted). "Liability for violations of Section 5 extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security issues.'" *U.S. SEC v. East Delta Resources Corp.*, No. 10-CV-310 (SJF)(WDW), 2012 WL 3903478, at *4 (E.D.N.Y. 2012) (citing *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007)). "An indirect participant, who has not himself passed title to an unregistered security, may nevertheless

be liable for its offer or sale." *Universal Express, Inc.*, 475 F. Supp. 2d at 422. The necessary participant test asks "whether the defendants' acts were a substantial factor in the sales transaction." *Id.* (internal quotation marks and citation omitted). "A plaintiff need not also show scienter to prove a Section 5 violation." *Id.* "Once the SEC has established its prima facie case, the burden of proof shifts to defendants to show that an exemption or safe harbor from registration exists." *Schoengood*, 2023 WL 7000984, at *10.

Here, the Complaint alleges that Timothy Page and the Corporate Defendants sold shares in BioHemp without effective registration statements, satisfying the first requirement of Section 5. (Compl. ¶ 63.) *See, e.g., Am. Bank & Trust Co. v. Barad Shaff Securities Corp.*, 335 F. Supp. 1276, 1279 (S.D.N.Y. Jan. 5, 1972) (finding the allegation that a stock was sold without a proper registration statement sufficient). As previously detailed, these Defendants sold these unregistered shares through a scheme in which Timothy Page directed the Corporate Defendants to obtain BioHemp stock and then transfer that stock to a foreign broker that subsequently sold it. (Compl. ¶¶ 56-58.) Because Timothy Page and the Corporate Defendants' actions were all integral to the sale of these unregistered shares, they engaged in steps necessary to their distribution, this satisfies the second requirement of Section 5. Finally, because the parties were foreign individuals and entities that communicated among themselves and with other foreign brokers to effectuate the sales in the United States, the requirement that the sales utilized interstate communication is met. (Compl. ¶¶ 57-58.) *See U.S. SEC v. Verdiramo*, 890 F. Supp. 2d 257, 272 (S.D.N.Y. Sept. 9, 2011) (finding that sales were conducted by interstate means because they went through a brokerage account).

Having established a prima facie case, the burden shifts to Timothy Page and the Corporate Defendants to show that an exemption or safe harbor from registration exists. Because they have defaulted, they do not satisfy their burden to establish an exemption from registration. *See Schoengood*, 2023 WL 7000984, at *10.

Accordingly, I respectfully recommend that the Court find Timothy Page and the Corporate Defendants liable for violations of Sections 5(a) and 5(c) of the Securities Act.[5]

### D. Section 13(d) of the Exchange Act

Section 13(d)(1) of the Exchange Act and Rule 13d-1 together require any individual or entity acquiring beneficial ownership of more than 5 percent of a voting class of an equity security of a company registered under Section 12(g) of the Exchange Act to disclose, *inter alia*, their identity and the purpose of the acquisition.  15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-101.  A beneficial owner of a security is "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares . . . investment power which includes the power to dispose, or to direct the disposition, of such security."  Rule 13d-3.  "When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person.'"  15 U.S.C. § 78m(d)(3).  The number of outstanding shares found in the company's most recent quarterly, annual, or current reports filed with the SEC is used to calculate whether the 5% threshold has been reached.  *See SEC v. Nutra Pharma Corp.*, No. 18-CV-5459 (JS)(ST), 2022 WL 3912561, at *13 (E.D.N.Y. Aug. 31, 2022).  Within ten business days of acquiring such a share, the individual or entity must file a Schedule 13D with the Commission.  *See U.S. SEC v. Tamarind Investments, Inc.*, No. 20-CV-7 (LGS)(KHP), 2021 WL 12096112, at *4 (S.D.N.Y. Feb. 1, 2021).  Scienter is not required to establish a violation of Section 13(d).  *See, e.g.*, *Nutra Pharma Corp.*, 2022 WL 3912561, at *13.

Here, the Complaint alleges that BioHemp had a voting class of equity securities registered under Section 12 of the Exchange Act.  (Compl. ¶ 64.)  In March 2019, BioHemp issued 25,000,000

---

[5] The Complaint also sufficiently alleges that Timothy Page violated Sections 5(a) and 5(c) of the Securities Act with respect to the sale of EnviroTechnologies stock by utilizing a similar scheme with different companies not named as defendants in the underlying case.  (*See* Compl. ¶¶ 36-42, 53.)  However, these allegations are not raised in connection with Plaintiffs' motion for default judgment.

restricted shares to FJ Investments, granting Timothy and Trevor Page control of 99.9% of BioHemp's outstanding stock. (*Id.*) Because Timothy Page was empowered to, and subsequently did, dispose of those shares, he acquired beneficial ownership of those shares such that he was required to file a statement of beneficial ownership within ten days of acquiring that ownership. (*Id.* ¶¶ 58, 65.) The Complaint alleges that he failed to file such statement, and, therefore, he violated Section 13(d)(1) of the Exchange Act and Rule 13d-1(a). (*Id.* ¶ 65.)

Accordingly, I respectfully recommend that the Court find Timothy Page liable for violating Section 13(d)(1) of the Exchange Act.

### E.  Relief Defendant Janan Page

"Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (citation omitted).

Here, the SEC has alleged that Janan Page received investor funds derived from the unlawful acts, practices and scheme detailed in the Complaint. (Compl. ¶ 87.) For example, during October and November 2016, Timothy Page caused a foreign account to transfer approximately $410,000 to a bank account partially controlled by Janan Page. (*Id.*) Moreover, Janan Page did not provide consideration for these proceeds, and therefore has no legitimate claim to those funds. *See SEC v. China Energy Sav. Tech., Inc.*, 636 F. Supp. 2d 199, 206 (E.D.N.Y. 2009).

Accordingly, I respectfully recommend that the Court order equitable relief against Janan Page.

## V.    Damages and Other Relief

### A.  Injunction Forbidding Securities Law Violations

The SEC seeks an injunction permanently enjoining Timothy Page and the Corporate Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder

and Sections 5 and 17(a) of the Securities Act, and enjoining Timothy Page from violating Sections 9(a) and 13(d) of the Exchange Act. (Dkt. 60 at 2-5; Dkt. 75 at 2-4; Lavin Decl. ¶¶ 47-52; SEC Mem. at 10-13.)

Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act authorize a court to issue injunctive relief upon a showing that (1) violations of the securities laws have occurred and (2) a reasonable likelihood exists that violations will occur in the future. *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978). "To determine whether a reasonable likelihood of recurrent violations exists, courts generally consider factors like (1) the egregiousness of the conduct, (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved, (4) the sincerity of the defendant's assurance against future violations; and (5) the defendant's recognition of the wrongful nature of his conduct." *SEC v. Rinfret*, No. 19-CV-6037 (AJN), 2020 WL 6559411, at *4 (S.D.N.Y. Nov. 9, 2020) (citing *SEC v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998)); *SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04-CV-1303 (NGG), 2010 WL 4668777, at *1 (E.D.N.Y. Nov. 9, 2010)). In the default judgment posture, courts accept a complaint's allegations as true when evaluating these factors. *See, e.g.*, *Rinfret*, 2020 WL 6559411, at *5 (finding that injunctive relief was proper based on "the Commission's allegations, taken as true").

Taking the allegations in the Complaint as true, these factors favor granting the SEC's request. The allegations set forth that Timothy Page orchestrated multiple schemes to manipulate the stock of four issuers over a period of four years and attempted to conceal his deceptive behavior by utilizing nominees, such as the Corporate Defendants. These actions were not isolated incidents—rather, they constituted a series of calculated acts. As previously described, Timothy Page acted with a high degree of scienter, which is imputed to the Corporate Defendants based on his control of them. In addition, because Defendants have not appeared in this litigation, "there is no representation before this Court

that this conduct will not reoccur or that Defendants have recognized the wrongful nature of their behavior." *Rinfret*, 2020 WL 6559411, at *5.

Accordingly, I respectfully recommend that the Court grant the SEC's request for an injunction enjoining Timothy Page and the Corporate Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and Sections 5 and 17(a) of the Securities Act, and enjoining Timothy Page from violating Sections 9(a) and 13(d) of the Exchange Act.

### B. Conduct-Based Injunction

The SEC also seeks an injunction that permanently enjoins Timothy Page from "directly or indirectly, including, but not limited to, through an entity owned or controlled by [him], participating in the issuance, purchase offer, or sale of any security; provided, however, that such injunction shall not prevent [him] from purchasing or selling securities listed on a national securities exchange for [his] own personal account[ ]." (Lavin Decl. ¶ 58.)

"The Court has wide discretion to impose a conduct-based injunction in SEC actions." *Sec. & Exch. Comm'n v. CKB168 Holdings, Ltd.*, No. 13-CV-5584 (HG), 2022 WL 3347253, at *4 (E.D.N.Y. Aug. 12, 2022). The SEC argues that such an injunction would be "appropriate and tailored to the conduct in this case" given that Timothy Page "engaged in a series of fraudulent schemes involving the illegal sale of at least four microcap issuers, defrauding hundreds of unsuspecting investors." (Lavin Decl. ¶ 58.) For the same reasons discussed in awarding injunctions against Timothy Page forbidding him from committing securities laws violations, *supra*, I find this argument persuasive. *See, e.g., CKB168 Holdings,* 2022 WL 3347253, at *4 (reaching a similar holding). Accordingly, I respectfully recommend that the SEC's requested conduct-based injunction be granted.

### C. Disgorgement of Illegal Proceeds and Prejudgment Interest

The SEC seeks an order requiring the Defaulting Defendants to disgorge the illicit proceeds they received from the fraudulent schemes. (Compl. ¶ 4; Lavin Decl. ¶¶ 64-67; SEC Mem. at 14-15.)

Disgorgement is "a well-established remedy in the Second Circuit, particularly in securities enforcement actions." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation'; 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (alterations in original) (quoting *SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995)). Nevertheless, given that disgorgement "is remedial rather than punitive, the court may not order disgorgement above" the "amount of money acquired through wrongdoing . . . plus interest." *Cavanagh*, 445 F.3d at 116 and n.25.

Here, disgorgement is an appropriate remedy to ensure that the Defaulting Defendants do not profit from Timothy Page and the Corporate Defendants' violations of the securities laws. *See Liu v. SEC*, 140 S.Ct. 1936, 1940 (2020) ("It would be inequitable that a wrongdoer should make a profit out of his own wrong") (cleaned up).

The SEC has estimated what it believes to be the appropriate disgorgement amounts, supported by the Declaration of Ryan D. Murphy ("Murphy Decl.," Dkt. 59), an Enforcement Account for the SEC. In his Declaration, Murphy outlines the process by which he first determined the gross trading proceeds for each of the Defaulting Defendants, and then, after deducting any amounts paid out from the accounts of each Defaulting Defendant, calculated the net proceeds from the securities violations. (Murphy Decl. ¶¶ 8-13.) The Court has reviewed these calculations and finds that the SEC's request as to each Defaulting Defendant's disgorgement—net proceeds of $7,652,228 as to Timothy Page, $1,928,907 as to Wellesley, $753,239 as to Porrima, $456,963 as to Emergent, and $1,085,000 as to Janan Page—are reasonable. (*See* Murphy Decl. ¶ 13; Lavin Decl. ¶ 66; SEC Mem. at 14-15.)

Accordingly, I respectfully recommend that the SEC's request for disgorgement be granted and that the Defaulting Defendants be required to make payment in the following amounts: $7,652,228 as to Timothy Page, $1,928,907 as to Wellesley, $753,239 as to Porrima, $456,963 as to Emergent, and $1,085,000 as to Janan Page.

### D. Prejudgment Interest

The SEC also requests prejudgment interest on its requested disgorgement as to the Defaulting Defendants. (Compl. ¶ 4; Lavin Decl. ¶¶ 68-71; SEC Mem. at 16.)

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *First Jersey Securities, Inc.*, 101 F.3d at 1476 (internal quotation marks and citation omitted). A court "generally calculates prejudgment interest by using the Internal Revenue Service ('IRS') rates for underpayment of taxes under 17 U.S.C. § 201.600(b)." *SEC v. Bocchino*, No. 98-CV-7525 (JGK)(RLE), 2002 WL 31528472, at *3 (S.D.N.Y. Nov. 8, 2002). This is because the IRS underpayment rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey Securities, Inc.*, 101 F.3d at 1476.

Here, the SEC has calculated prejudgment interest on the disgorgement amount as to each of the Defaulting Defendants by assuming, favorably to each of the Defaulting Defendants, that each year's net proceeds were received on the last day of the calendar year. (Murphy Decl. ¶ 15.) For each year's prejudgment interest calculation, the SEC started from December 31 of that year, and calculated interest through December 10, 2021, the date the Commission obtained a freeze on Defendants' assets in this case.[6] (Lavin Decl. ¶ 69; SEC Mem. at 16; Murphy Decl. ¶ 15; *see* Dkt. 26.) In calculating

---

[6] The SEC appropriately does not request prejudgment interest beyond December 10, 2021, the date on which the Court ordered a freeze on Defendants' assets (Lavin Decl. ¶ 69; SEC Mem. at 16; Murphy Decl. ¶ 15). *See SEC v. Ahmed*, 72 F.4th 379, 403 (2d Cir. 2023) ("The district court did not abuse its discretion by awarding prejudgment interest at the IRS underpayment rate for the period before the asset freeze").

prejudgment interest, the SEC used the IRS underpayment rate. (Lavin Decl. ¶ 69; SEC Mem. at 16; Murphy Decl. ¶ 16.) The SEC's calculations yield a prejudgment interest figure of $983,819 as to Timothy Page, $133,853 as to Wellesley, $52,270 as to Porrima, $34,298 as to Emergent, and $181,296 as to Janan Page. (Lavin Decl. ¶ 70; SEC Mem. at 16; Murphy Decl. ¶ 17.)

Because the Defaulting Defendants benefitted from the illicit payments, they should repay an approximation of the interest so that they do not receive the benefit of "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).

Accordingly, I respectfully recommend that the Defaulting Defendants be required to pay prejudgment interest on their ill-gotten gains in the following amounts: $983,819 as to Timothy Page, $133,853 as to Wellesley, $52,270 as to Porrima, $34,298 as to Emergent, and $181,296 as to Janan Page

### E.  Joint and Several Liability

The SEC seeks to hold the Corporate Defendants and Janan Page joint and severally liable for portions of the total disgorgement and prejudgment interest amount owed by Timothy Page. (Lavin Decl. ¶ 71; SEC Mem. at 15). The SEC seeks to hold each Corporate Defendant and Janan Page jointly and severally liable for Timothy Page's disgorgement and prejudgment interest up to the amount of their own disgorgement and prejudgment interest. (*See* Lavin Decl. ¶ 5.) The SEC argues that this is appropriate because these Defendants' bank accounts were used interchangeably for purposes of deception and, as noted, the Corporate Defendants were used as nominees to conceal Timothy Page's identity and facilitate his misconduct. (Lavin Decl. ¶ 71; SEC Mem. at 15.)

Joint and several liability is permitted for disgorgement and prejudgment interest where two or more individuals or entities collaborate to violate federal securities law. *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013) ("in light of their collaboration," defendants should be held liable for disgorgement award on a joint and several basis); *SEC v. Tecumseh Holdings Corp.*,

2011 WL 2076466, at *2 (S.D.N.Y. May 24, 2011) (holding defendants joint and severally liable for prejudgment interest).

Because the Corporate Defendants collaborated with Timothy Page to effectuate the schemes, I respectfully recommend that they be held joint and severally liable for the disgorgement and prejudgment interest owed by Timothy Page, up to the amount of their own disgorgement and prejudgment interest: $2,062,760 for Wellesley, $805,508 for Porrima, and $491,261 for Emergent.

The SEC has not accused Relief Defendant Janan Page of any responsibility for Timothy Page or the Corporate Defendants' violations of the securities laws. Accordingly, I respectfully recommend that Janan Page not be held joint and severally liable for any disgorgement and prejudgment interest owed by Timothy Page. *See SEC v. Yin*, No. 17-CV-972 (JPO), 2023 WL 2753094, at *8 (S.D.N.Y. Mar. 31, 2023) (finding that "the concept of joint and several liability does not apply" to a relief defendant who was not accused of being responsible for insider trading).

### F. Civil Penalties

The SEC requests third-tier civil penalties against Timothy Page and the Corporate Defendants equal to the amount of pecuniary gains attributable to each of them, respectively. (Lavin Decl. ¶ 72; SEC Mem. at 17.)

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act permit a court to impose, upon a proper showing of violation, a civil penalty from one of three tiers of penalties. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). As relevant here, the third tier of these penalties are reserved for "the most serious violations." *SEC v. Skelley*, No. 18-CV-8803 (LGS)(DF), 2021 WL 863298, at *8 (S.D.N.Y. Feb. 25, 2021), *R&R adopted* 2021 WL 1164594 (S.D.N.Y. Mar 26, 2021). Third-tier penalties may be imposed where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 78u(d)(3)(B)(ii-iii).

For violations occurring after November 2, 2015, such as here, third-tier penalties may be up to $223,229 for natural persons and up to $1,116,140 for entities, or the amount of a defendant's pecuniary gain. *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2024), *available at* https://www.sec.gov/enforce/civil-penaltiesinflation-adjustments.htm.

"In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Milligan*, 436 F.App'x 1, 3 (2d. Cir. 2011) (quoting *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a discretionary nature and each case has its own particular facts and circumstances which determine the appropriate penalty to be imposed." *SEC v. Constantin*, No. 11-CV-4642 (MHD), 2013 WL 1828815, at *3 (S.D.N.Y. Apr. 25, 2013) (cleaned up).

Here, Timothy Page and the Corporate Defendants engaged in a scheme over the course of multiple years by which they deliberately and successfully defrauded investors of millions of dollars for their own gain. As discussed, they acted with a high degree of scienter. There is no evidence of any mitigating factors such as an attempt to remedy their wrongdoing or to return any misappropriated assets. *See SEC v. Premier Links, Inc.*, No. 14-CV-7375 (CBA)(ST), 2022 WL 5422661, at *6 (E.D.N.Y. July 27, 2022).

Accordingly, I respectfully recommend that the Court impose third-tier civil penalties against Timothy Page and the Corporate Defendants in the amounts of their respective pecuniary gains: $7,652,228 against Timothy Page, $1,928,907 against Wellesley, $753,239 against Porrima, and $456,963 against Emergent. *See, e.g.*, *SEC v. Nostra Energy Inc.*, No. 15-CV-4751 (WHP), 2016 WL 5793983, at *1 (S.D.N.Y. Sept. 20, 2016) ("the egregiousness of the violations and recurrence of the conduct favor the imposition of substantial third-tier civil penalties"); *SEC v. Spongetech Delivery Sys.*, No. 10-CV-2031 (DLI)(RML), 2015 U.S. Dist. LEXIS 134233, at *16 (E.D.N.Y. Aug. 3, 2015) (imposing third-tier penalty where defendant's conduct "taking place over several years" was "egregious, deliberate, and resulted in significant losses"); *Constantin*, 2013 WL 1828815, at *4 ("in light of defendants' pattern of fraudulent misconduct and the significant financial losses that they had caused their clients, each of the defendants should be subjected to third-tier civil penalties").

## **CONCLUSION**

For the reasons set forth above, I respectfully recommend that the Court find Timothy Page and the Corporate Defendants liable for violations of Sections 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, Sections 5(a) and (c) and 17(a)(1) and (3) of the Securities Act; find Timothy Page liable for violations of Sections 9(a)(2) and 13(d) of the Exchange Act; and order equitable relief against Relief Defendant Janan Page.

I further respectfully recommend that the Court:

1. Permanently enjoin Timothy Page and the Corporate Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and Sections 5 and 17(a) of the Securities Act;

2. Permanently enjoin Timothy Page from violating Sections 9(a) and 13(d) of the Exchange Act;

3. Permanently enjoin Timothy Page from participating in the issuance, purchase offer, or sale of any security; provided, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

4.  Order the disgorgement of the illegal proceeds and prejudgment interest in the following amounts:

    a.  Timothy Page: $7,652,228 in disgorgement; $983,819 in prejudgment interest;

    b.  Wellesley: $1,928,907 in disgorgement; $133,853 in prejudgment interest;

    c.  Porrima: $753,239 in disgorgement; $52,270 in prejudgment interest;

    d.  Emergent: $456,963 in disgorgement; $34,298 in prejudgment interest;

    e.  Janan Page: $1,085,000 in disgorgement; $181,296 in prejudgment interest;

5.  Order that the Corporate Defendants be jointly and severally liable for Timothy Page's disgorgement and prejudgment interest in the following amounts:

    a.  Wellesley: $2,062,760;

    b.  Porrima: $805,508;

    c.  Emergent: $491,261; and

6.  Impose civil penalties in the following amounts:

    a.  Timothy Page: $7,652,228;

    b.  Wellesley: $1,928,907;

    c.  Porrima: $753,239;

    d.  Emergent: $456,963.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation.  *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

*Peggy Kuo*
_____
PEGGY KUO
United States Magistrate Judge

Dated:  Brooklyn, New York
        September 13, 2024